[No. 934. Decided June 5, 1893.]

THE STATE OF WASHINGTON, *on the relation of T. M. Reed, jr.,* v. W. C. JONES, *Attorney General.*

STATUTES — REGULARITY OF PASSAGE — CONCLUSIVENESS OF EN-
ROLLED BILL.

The enrolled bill on file in the office of secretary of state of an act of the legislature, which is duly signed by the presiding officers of both houses, and otherwise appears fair upon its face, is conclusive evidence of the regularity of all proceedings necessary for its proper enactment in conformity with the constitutional provisions.

*Original Application for Mandamus.*

*John W. Corson,* and *Roger S. Greene,* for relator.

*W. C. Jones,* Attorney General, for respondent.

The opinion of the court was delivered by

HOYT, J.— Respondent, as attorney general, was charged by an act of the legislature, or what purports to be such, with the duty of approving the bond of the relator as one of the board of state land commissioners provided for by said act.   This duty he refused to perform, on the ground that what purported to be the act of the legislature was not in fact such, for the reason that the constitutional requirements had not been observed by the legislature in its passage.   This proceeding is brought on the part of the relator to compel such action by respondent.

There is a line of authorities which we might follow and dispose of this case without at all entering into the question as to whether or not, in fact, said purported act of the legislature should have force as such, but in view of the great importance of a prompt determination of the question as to whether or not said purported act is in force, and of the further fact that the elaborate briefs filed upon the part of the respective parties will enable the court to as intelligently determine that question in this proceeding as in any other, we have concluded that our duty to the parties and to the public will be best performed by disregarding all preliminary questions which might be raised and determining the rights of the parties upon the broad ground, upon which it has been largely argued, as to whether or not such purported act is in fact a part of the statute law of this state.

It is claimed on the part of the respondent that it cannot have such force by reason of the fact that the legislature has not complied with the constitutional requirements by which a certain subject matter can be enacted into a law. It is not contended but that the enrolled bill on file in the office of the secretary of state is in all respects regular upon its face, and bears the signatures of the presiding

officers of the respective houses of the legislature in due form, and has been regularly approved by the governor, and deposited in said office as required by the provisions of the constitution in that regard. But it is claimed that an examination of the journals of the respective houses will show that the legislature disregarded several mandatory provisions of the constitution which it was incumbent upon them to observe before any bill could become a law. The argument upon what is shown by the journal, and the effect thereof, has been elaborate and full, and the publicity which has been thereby given to the manner in which such journals have been kept, and the want of care exercised by the legislature in seeing that a compliance with constitutional provisions are made to appear therein, cannot but be beneficial, whatever may be the effect thereof in the decision of the question now before the court.

Preliminary to entering upon the question thus argued, we must decide another question, which, if determined adversely to the position of the respondent, will make it improper for us to enter at all upon the discussion as to the effect of the journal entries above referred to. This is as to the effect to be given to the enrolled bill on file in the office of the secretary of state. It is claimed on the part of the relator that such enrolled bill is absolutely conclusive of the fact that it had been regularly enacted into a law by the legislature, and if this be true it is of course immaterial as to what the journals or any other proof may or may not show upon this subject. As to just what force the respondent is willing to concede to such enrolled bill is not entirely clear from his argument, though it may probably be fairly deduced therefrom that he is willing to concede that it *prima facie* establishes the fact of the regularity of its passage through the legislature, but that such *prima facie* proof is overcome whenever there is a suggestion to the court that the journal or other competent proof

shows that some constitutional requirement has not been complied with; that upon such suggestion the courts must take judicial notice of what the journals show in that regard, and if it appear to the court therefrom that there has been such violation of constitutional requirements it must be held that the enrolled bill is not in force as a law.

That this is the position of the respondent seems certain from the line of authorities which he has cited to sustain it, as nearly or quite all of them hold that such *prima facie* presumption attaches to the enrolled bill. If this is not his position, then it must be that the enrolled bill is proof of nothing, and that in every case the courts and all the inhabitants of the state must take notice of the course of the legislature as to every step relating to the passage of a bill, so far as such steps are made obligatory upon the legislature by the constitution. If the courts were to hold with this latter contention it would lead to such results as to almost justify revolution on the part of the people. With such a construction once sanctioned by the courts, it would follow that in however good faith an individual or an officer might act in view of the law as it appeared in the enrolled bill, such seeming law nor such good faith could in no manner protect him from the result of his acts if in fact the journals failed to show that the act had been regularly passed by the legislature. Hence, a person might, while supposing that he was acting directly in accordance with the laws of the state, be in fact committing a crime, and an officer who should venture to pay out money in pursuance of what thus seemed to be the law, could be called upon to account for the same as having been paid out in violation of all law, if in fact such seeming law had not been constitutionally passed as shown by the legislative journals. That such must be the result, if the signing by the presiding officers and the approval by the governor are to be considered only as steps in the act of making the bill a law, and not in

themselves proof of such fact, seems clear under well settled rules relating to construction. If such signing and approval are only steps, then the fact that they have been taken in no manner proves that any other required step has been taken, and it must follow that before the courts can find that the bill has become a law, they must look and see that all the steps required by the constitution to constitute it such have been observed by the legislature. Such a construction given to the enrolled act would render it practically impossible for the courts even to determine what was the law, and would render it absolutely impossible for the average citizen to ascertain that of which he must at his peril take notice. There is enough injustice in requiring the citizen to take notice of the statute law, when to do so he has only to determine the legal effect of the enrolled acts on file in the office of the secretary of state, and if he is further required to take notice of all that is shown by the journals of the legislature which may affect the regularity with which such acts have been passed, he will indeed be in a sorry condition. The absolutely disastrous result of this construction has led the courts which have held· that they could go behind the enrolled act to adopt the theory, which seems to us to be entirely illogical, that the enrolled acts *prima facie*, but not conclusively, establish the fact of their regular enactment. Such holding compels the further one that whenever the attention of the courts is directed to the particular parts of the journal which show a want of compliance with constitutional requirements, the courts must take judicial notice of all facts therein contained in relation to the point to which their attention has thus been called, and if such journals show any want of compliance with the mandates of the constitution, declare such *prima facie* presumption overcome and the law invalid. The result of this construction will lead to results as disastrous and embarrassing as would the other construc-

tion of which we have been speaking. For a number of years after the passage of an act it may be given force by the courts by reason of the *prima facie* presumption flowing from the finding of the act regularly enrolled and signed in the office of the secretary of state. Then after said act to all intents and purposes has been treated as in force during all of these years, upon the suggestion of some person that there was a fatal omission in the journal entries regarding the passage thereof, the court must take judicial notice of such fact if shown by the journal, and from that time on it must be held not only that such bill was not then a law, but that it never had been such. The confusion as to rights and duties growing out of such a state of uncertainty as to what the statute law of the state is may well appall one who even superficially contemplates the same. Worse than this may happen, however. The suggestion as to the invalidity of the law may be made to one superior court in the state, and from that moment such court must hold the law invalid if the journal shows any constitutional irregularity in its passage, while in another superior court said act will still be given full force as a law by reason of the fact that no suggestion has been made which will authorize the court to go behind the *prima facie* presumption flowing from the enrolled bill. If from the enrolled bill on file it can be conclusively presumed that it has been regularly enacted by the legislature, none of these evil consequences will follow, and the duty of the courts will be confined exclusively to ascertaining the effect of such law.

It follows that, as a matter of public policy as well as of convenience and certainty, the court should adopt the rule which makes such enrolled bills conclusive evidence of their regular enactment, if it can do so without violating some fundamental constitutional provision or well settled rule of construction. As we have already stated, none of the cases cited by respondent go to the extent of holding,

as first above suggested, that the enrolled act on file is proof of nothing at all, and that the fact of its being thus found on file must be supplemented by the further affirmative finding from the journals that it has been regularly enacted before it can be given any force whatever, nor have we been able to find any cases going to that extent. We may, therefore, dismiss that construction from further consideration, though to us it seems to follow more logically from the course of the argument of respondent than does that upon which, under the authorities, he must rest his case.

As a basis for our further discussion, then, it may be accepted as a fact that all of the courts hold that these enrolled bills are *prima facie* the law, and that they must be given force as such until their invalidity is suggested in some proceeding. Yet to hold that this *prima facie* presumption attaches, and a conclusive one does not, seems to us to be illogical in the highest degree. Beside, there is something ridiculous in holding that there can be such a thing as a *prima facie* law. It is true that it is frequently the duty of courts and citizens to accept certain things as *prima facie* proof of what the law is, but that is an entirely different proposition from holding that a certain thing is *prima facie* a law. An act of the legislature, when regularly on file in the office of the secretary of state, is, and must necessarily be, either a law or not a law, and it is preposterous to hold that that which is the law is so only *prima facie*, or to hold that that which is in fact not a law is even *prima facie* so. What constitutes the statutory law of a state must necessarily be an absolute proposition, and not simply a *prima facie* one. The statutes published by authority do not purport to be the law; they only purport to be copies of the law as it is, and *prima facie* show that fact. It is perfectly competent for the legislature, not only to so provide, but it may in almost

any other way provide, what may *prima facie* be taken
to have the force and effect of the original law, but this is
the extent to which the legislature can go.   It can provide
various methods of proving the existence of the original
law, other than its actual production, but the entire force
of all these substitutes is to show what the original law on
file in the office of the secretary of state is.   The enrolled
bill on file is either what it purports to be, a law regularly
passed through the legislature, or it is nothing whatever.
If it was in fact regularly passed, it is a law, not simply
*prima facie* a law, but conclusively so.   If the courts can
give any force whatever to the fact that it has not been
regularly passed through the legislature, then the courts
must take it as the facts show, and cannot in the event of
its not having been regularly passed through the legisla-
ture give it any force whatever.   But, as we have seen,
there are none of the courts but what go so far as to hold
that such enrolled bills are *prima facie* the law.   Upon
what ground can they do this?   We are unable to discover
but one ground upon which any satisfactory reasoning can
be founded, and that is because they are the final records
of the acts of the legislative department regularly certified
by it, as required by the constitution for the information
and guidance of the other departments of the government.
If they are not such final records then the placing of them
on file signed and approved can be no more than one of
the steps devolving upon the legislature in making a law,
and, until the other necessary steps are also made to ap-
pear, there is nothing to show the court in any manner
whatever that the necessary steps to make it a law have
been taken.

It seems, therefore, to follow as a necessary conclusion
that all of the courts have looked upon these enrolled bills
as the final records of the legislative department in the en-
actment of laws, and if this is so, why should they not be

given the sanctity and force incident to final records? If
they are final records in any sense whatever it is because,
under the provisions of the constitution, interpreted in the
light of the universal practice of legislative bodies, it must
be held that such bodies are authorized to make up an au-
thoritative record certified in a certain way, and that this
record when so made up carries with it as a necessary im-
port the fact that all the steps which led up to the making
of such record have been regularly taken, and if from such
record it can be *prima facie* presumed that all the neces-
sary steps have been taken, it seems to logically follow
that such facts should be conclusively presumed therefrom.
The legislature is a coördinate branch of the government,
and cannot in any sense be said to be an inferior body;
consequently its final record, when certified and recorded
as required by the constitution, imports absolute verity.
There is no reason why the final record thus made up by
the legislative department of the government should not
be conclusive of the fact that all the steps necessary to
make up such record had been regularly taken, the same
as the judgment of a court of competent jurisdiction is of
all the facts necessary to sustain it. The decree of a court
of general jurisdiction, if fair upon its face, proves itself,
and is conclusive of all the facts necessary to sustain it,
and upon principle the same rule should obtain as to the
final record of the legislature in the enactment of a law.
In this regard it may be suggested that the final record of
a court of general jurisdiction may be attacked upon sev-
eral grounds, and the attack sustained by proof of what
occurred in the progress of the case before it was made up.
This is only true when such attack is made in a direct pro-
ceeding against such record and never when the same is
brought in question collaterally. And as there is no
method provided by the constitution or laws for a direct
attack upon an enrolled bill, it follows that if an attack

upon it is to be made at all it must be made in a collateral
proceeding.   Hence, the point we are trying to make is
aided instead of met by such suggestion.

But it is argued with great force on the part of the re-
spondent that if the courts do not look into the proceedings
of the legislature, and set aside laws when not enacted with
the formalities required by the constitution, the legislature
can at pleasure nullify all such provisions.   This is no
doubt true, and it is upon this line of reasoning that those
courts which have gone behind the enrolled bill have justi-
fied themselves in so doing.   This line of reasoning seems
to assume that the judicial department is charged with see-
ing that all the mandatory provisions of the constitution
are complied with.   But is this a reasonable construction,
in view of the theory of our government and the principles
enunciated in our constitution?   Each of the three depart-
ments into which the government is divided are equal, and
each department should be held responsible to the people
that it represents, and not to the other departments of the
government, or either of them.   What are the respective
duties of these departments?   They may be briefly stated
thus: The legislature enacts laws, and is commanded by
the constitution to enact them in a certain way; the execu-
tive enforces the laws, and by the constitution it is made
his duty to take certain steps looking towards such en-
forcement in the manner prescribed therein upon the hap-
pening of certain contingencies; the judicial department is
charged with the duty of interpreting the laws, and ad-
judging rights and obligations thereunder.   What is the
law upon which the judicial department must thus de-
termine rights and obligations?   It is—*First*, The consti-
tution of the state; *second*, so much of the common law as
is in force here, and the laws of the legislature; and, *third*,
the acts of the executive department in those matters in
which, under the constitution, it is given the power to ex-

ercise discretion under certain contingencies. Such being the respective duties of the several departments, it seems to us that the acts of each of them when certified as required by the constitution, or by such a universal course of practice as to have the force of a constitutional provision, should be conclusive upon each of the other departments, and there would seem to be no more impropriety in the legislature seeking to go behind the final record of a court, for the purpose of determining whether or not it had obeyed the constitutional directions in making such a record, than there would be in the courts seeking to go behind the final record made by the legislative department. As we have seen, the executive, under the constitution, is charged with doing certain things upon certain contingencies happening, and under the constitution he is given no power thus to act excepting upon such contingency; yet if the governor determines that such contingency exists, and acts in pursuance thereof, no court, so far as we have been able to see, has ever sought to inquire into the fact as to whether or not the contingency upon which the governor had founded his action in fact existed. For instance, under the constitution, the governor is authorized to convene the legislature upon extraordinary occasions, and there would seem to be the same reason for a court refusing to give force to his proclamation thus convening the legislature, if, upon investigation, it found that the extraordinary occasion upon which the governor had assumed to act did not in fact exist, as there would be to go back of the record made by the legislature. To preserve the harmony of our form of government it must be held that these several mandatory provisions are addressed to the department which is called upon to perform them, and that neither of the other departments can in any manner coerce that department into obedience thereto. Courts have gone behind the final records of the legislative department upon

what seems to us a false theory.   They have assumed that the mandatory provisions of the constitution are safer, if the enforcement thereof is entrusted to the judicial department, than if so entrusted to the legislature; in other words, they have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution.   How the courts have obtained this idea is somewhat difficult to ascertain, but that they entertain it, and have allowed it to influence their decisions, is so evident that even a superficial examination of such decisions will satisfy any one of the fact.

But it is said that all courts assume some superiority over the legislature for the reason that they refuse to give force to an act which upon its face violates some provision of the constitution.   A brief examination will show that such conclusion is unwarranted by the fact stated.   Courts are called upon to adjudicate rights under the laws of the state.   Those laws are made up of the provisions of the constitution, the common law and the acts of the legislature and the acts of the executive, when by the constitution he is authorized to act in such a way as to affect rights or obligations.   The constitution comes to all of the departments directly from the people, and is the supreme law of the land, and can in no manner be changed or affected by the action of either the legislative or executive department.   The rest of the law comes to each of such departments, authenticated in the way the constitution or custom requires, from the hands of the other departments, and though they each take it as verity, and give it the full force which it can derive as the expressed will of the department from which it emanates, yet when it comes in conflict with the constitution, it must yield, for the reason that such constitution has a sanction greater than could be given by the action of all of the departments, and must

stand as against the action of any one or all of them. Upon principle, then, in view of the division into departments under our form of government, each of equal authority, one department cannot rightfully go behind the final record certified to it or to the public from either of the other departments. And the judicial department is no more justified in going behind the final act of the legislature to see if it has obeyed every mandatory provision of the constitution than has the legislature to go back of the final record made by the courts to see whether or not they have complied with all constitutional requirements.

If we investigate the question in the light of authority, and analyze the cases upon the subject in the light of the principle at the bottom thereof, it will be found that the overwhelming weight of authority is in favor of the proposition that courts will not go back of the enrolled bills on file in the secretary of state's office. It is true that a large number of courts have held that they would investigate the proceedings of the legislature to see if constitutional requirements had been complied with, but even these courts have nearly all of them conceded that the older decisions clearly establish the doctrine that such enrolled acts are conclusive, and have yielded their assent to such doctrine under the constitutions existing at the time the older cases were decided. They have argued, however, that for the reason that the newer constitutions contain many provisions mandatory upon the legislature as to its practice in enacting laws, the courts must see to it that such mandatory provisions are enforced, and as they cannot do this if they hold to said doctrine, they must refuse so to do, and look to the proceedings of the legislature which culminated in the enrolled act. If the courts are justified in the position above suggested, that the judicial department is superior to the others, this reasoning will have force, otherwise it cannot.

It is further argued that from the fact that most constitutions recently adopted contain an increased number of mandatory directions to the legislature, the courts are justified in changing the old rule and in going behind the enrolled act to see that the legislature obeys such directions. We are unable to see any force in such an argument. Under every government, which has as a part thereof a legislature, certain formalities on the part of such legislature are necessary before any subject matter can be given the force of law, and if the courts could not properly inquire into the fact as to whether or not such formalities had been complied with when but a single one was enjoined upon the legislature, there can be no good reason why it could do so when several are thus enjoined. The theory upon which the courts refused to go behind the enrolled bill when only such single formality was required, was that the enrolled bill was a final record, and imported verity, and if it imported verity when the one formality was required, why should it not import like verity when more than one is required? Under no government of this form could a bill become a law without the vote of a majority of a quorum in its favor, as such must be taken to be a part of the constitution either written or unwritten of every government proceeding according to any constitutional form whatever. If the alleged want of any requirement would justify going behind the enrolled bill, it would seem that it would be the one that a quorum was not present when the bill purported to have been passed for the reason that such an allegation would not only show that a formality required by every constitution before a bill should become a law, had been omitted, but would also show that a legal legislature had not been present at that time. Yet when such requirement was the principal one, substantially all of the courts held that the enrolled bill imported verity, and could not be attacked by showing that a quorum was

30—6 WASH.

not present when it was passed. The cases were not only practically uniform when such single formality was required, but they so continued even after they were called. upon to adjudicate as to the effect of such enrolled acts where some provisions of the constitution as mandatory as any of ours were in full force. And in many of the states where such formalities were required by the constitution there was fully as mandatory a provision as to the keeping of a journal, and requiring these formalities to be made of record therein, as is that in our constitution. This course of decisions continued for a long time, until at last some of the appellate courts seemed to assume that it was their duty, not only to supervise inferior courts, but also the other departments of the government.

We shall hereafter review a few of the many cases upon this subject, but at this point a word as to the opportunities for fraud growing out of the holding of such enrolled bills to be conclusive as compared with the contrary holding. We have already seen the disastrous results of the contrary holding in its general effect upon the community, and even a superficial examination of the question will show that the opportunities for committing a fraud upon the members of the legislature themselves will be much greater if the journals are allowed to control than they would be if the enrolled act is held conclusive. The enrolled acts are prepared with some care, and under the rules of our legislature and of every legislative body of which we have any knowledge, some committee is charged with the responsibility of seeing that such enrolled bills are compared with the one which actually passed the legislature before they are presented to the presiding officer for signature. There is, therefore, some protection thrown around these enrolled acts, and it would be a difficult matter for any one through carelessness or fraud to prevent the will of the legislature as expressed in the bill actually passed being

embodied in the enrollment thereof.   But if the doctrine be once established that the fact that such bill had passed can be negatived by the journal, there would be very little to prevent a bill which had been properly passed being defeated by the carelessness or fraud of the journal clerk or some employé under him.   Under the practice prevailing in the legislature of this state, and in most of the other states, there is very little assurance that the journal will fully and accurately show the proceedings of the body for which it is kept.   The practice in nearly all such bodies is to have the journal read, if read at all, from loose slips of paper made up partly in writing and partly by pasted slips, and after being thus read, ordered approved.   It is also a fact of which every one has knowledge that often upon such reading there is such inattention on the part of the members of the legislature that gross errors might pass unnoticed.   The journal as thus read and approved from loose slips of paper is then passed to the journal clerk, and by him, or under his direction, transcribed into a book, and the slips then carelessly preserved or entirely destroyed. The transcription of these minutes without any further action on the part of the legislature, or of any person but the one who makes it, except superficial examination by the journal clerk, and possibly by the presiding officer, becomes the formal journal.   It follows that the chances of mistake are very great, and for fraud upon the part of the copyist even greater.   The constitution requires that there should be a majority of the body recorded as voting in favor of a bill upon its final passage.   Upon such passage the bill in fact receives one or two more than such constitutional majority, and is duly passed, but if by carelessness or fraud the copyist should change one or two of the names of those voting, from the affirmative to the negative, the will of the legislature regularly expressed would be defeated.   And the same result might follow if in copying

he should omit a name. Not only would such results follow in the cases specified, but in many other ways the least error in making up or transcribing the journal might result in the defeat of the will of the legislature. Unless the method of keeping journals should at once be revolutionized, and so much attention be paid to them that they will be made to absolutely represent all the doings of the body to such an extent as to very much prolong the sessions of the legislature, the sanctity of legislative enactments will be entirely dependent upon the carefulness and good faith of some copyist employed by the legislature at a few dollars a day. Much less evil will grow out of a course of decision which will give the people to understand that the legislative is a department of the government of as high authority as the judicial, and that with the mandatory provisions directed to it the other departments of the government have no concern. When this is once well understood the people will see to it that such mandatory provisions are complied with by the legislature, or if they do not, the blame must rest upon themselves or the system of government which has as its basis the equal authority of the three departments into which it is divided.

We shall not attempt to review to any great extent the cases upon this subject. They are very numerous, and the older ones almost universally recognize the conclusiveness of the enrolled acts, and even under mandatory constitutional provisions, of substantially the same effect as our own, there are enough of the states which have adhered to the old doctrine to furnish us abundant authority for so doing, especially as such a course will in our opinion best subserve the public interest. The reasoning of the cases which uphold such doctrine is much more satisfactory than that of those upon the other side, for, as we have seen, the reasoning of the latter class of cases is founded upon the assumption that the courts are the guardians of all the

mandatory provisions of the constitution, whether addressed
to the judicial, legislative or executive department.  This
seems to us to be an untenable position, and, if it is, the
reasoning of this class of cases is worthy of very little con-
sideration.  While upon the other side the cases have for
their sanction not only a course of decisions running back
hundreds of years, but are also abundantly supported by
the reasoning therein contained, founded upon the nature
and form of our government and upon grounds of public
policy.

In our review of the cases upon the subject we shall omit
entirely all reference to the older ones, as it is conceded
that they are substantially all in favor of the proposition
that the enrolled acts are conclusive.  We shall confine
ourselves to the cases which may be called modern, and
substantially to those in states which have one or more
provisions in their constitution directed to the legislature
as mandatory as any in our own, and where by the pro-
visions of the constitution the legislature is · required to
keep and publish a journal of its proceedings.

The constitution of the United States expressly requires
a quorum of congress to be present for the transaction of
business.  It further requires that congress should keep a
journal of its proceedings and publish the same from time
to time.  In *Field v. Clark*, 143 U. S. 649 (12 Sup. Ct.
Rep. 495 ), the effect which the court would give to an en-
rolled act was directly passed upon, and after an elaborate
consideration it was held that the court must accept it as
conclusive proof that it had been regularly passed by con-
gress.  This case is entitled to more than ordinary consid-
eration, for the reason that it was briefed by counsel of
national reputation, and involved questions of the greatest
magnitude.  It is contended by respondent that much of
the force of this case is lost by reason of the fact that
the number of mandatory provisions in the constitution of

the United States is small compared with that in our own, but since, as we have attempted to show, the single requirement was of the most radical character, and went to the foundation of our form of government, such fact can in no manner detract from the force of the decision. And we cannot agree with the further contention of the respondent, that the judge who wrote the opinion intended to give any force to this line of argument in the reference therein made to the course of decisions in the states which had as a part of their constitution numerous mandatory provisions of this nature. We look upon the use of such language as having been simply by way of argument, and as tending to show that even although the decisions in such states might be warranted under their constitutional provisions, yet such fact did not necessarily militate against the position taken by him.

In the State of Louisiana, when the constitution of that state contained, among other mandatory provisions, one requiring it to keep a journal, and the express provision that "no bill shall have the force of a law until on three several days it be read in each house of the general assembly, and free discussion allowed thereon, unless four-fifths of the house where the bill is pending may deem it expedient to dispense with the rule," the supreme court of that state in the case of the *Louisiana State Lottery Co. v. Richoux*, 23 La. An. 743, directly held that the enrolled bill was conclusive upon the courts of the fact that all constitutional requirements had been complied with in its passage.

In *Whited v. Lewis*, 25 La. An. 568, the question was again before the court, and the same doctrine was unhesitatingly announced.

The constitution of the State of Mississippi contained many provisions as mandatory as any in our constitution, and in *Green v. Weller*, 32 Miss. 650, after a most elaborate

consideration, it was adjudged by the supreme court of
that state that the enrolled act was conclusive.   Under the
particular facts of that case there was some division of
opinion among the members of the court for the reason
that the bill, the effect of which they were passing upon,
was one providing for a constitutional amendment, and
some of them thought that proposals for amendments to
the constitution should stand upon a different basis than
other acts of the legislature; but they all agreed that the
rule would obtain in full force when applied to an ordinary
act of the legislature.

In *Swann v. Buck*, 40 Miss. 268, the same court had be-
fore it the question of the effect to be given to an enrolled
act on file in the proper office, and held directly that such
acts, when enrolled, signed by the presiding officers of the
two houses, approved by the governor, and deposited in
the office of the secretary of state, had all the legal inci-
dents of a record, imported absolute verity, and could not
be impeached.

In *Brady v. West*, 50 Miss. 68, this court seems inclined
to the contrary doctrine, but in *Ex parte Wren*, 63 Miss.
512, after a very full consideration of all the cases, the
court returned to the doctrine originally announced, and
showed by the most cogent reasoning that such enrolled
acts were and must necessarily be conclusive upon the
courts.

In the constitution of the State of New Jersey there
were many mandatory provisions directed to the legisla-
ture, among which was one requiring a majority of all the
members to vote in favor of the final passage of a bill be-
fore it became a law by ayes and noes, to be entered upon
the journal.   In *Pangborn v. Young*, 32 N. J. Law, 29, the
question under discussion was passed upon by the court of
errors and appeals of that state, and after most elaborate

consideration it was held that the courts could not go behind the enrolled act.

The State of Indiana has several provisions in its constitution of the mandatory nature of which we have been speaking, yet its supreme court has in a number of cases decided that the prior proceedings of the legislature could not be gone into for the purpose of affecting the validity of the enrolled act on file in the office of the secretary of state. One of such cases was that of *Evans v. Browne*, 30 Ind. 514, in which the court made use of language which so well meets the position taken by many who argue against the rule for which we are contending that we quote a portion thereof:

"But it is argued that, if the authenticated roll is conclusive upon the courts, then less than a quorum of each house may, by the aid of corrupt presiding officers, impose laws upon the state in defiance of the inhibition of the constitution. It must be admitted that the consequence stated would be possible. Public authority and political power must, of necessity, be confided to officers, who, being human, may violate the trusts reposed in them. This perhaps cannot be avoided absolutely. But it applies, also, to all human agencies. It is not fit that the judiciary should claim for itself a purity beyond others; nor has it been able at all times with truth to say that its high places have not been disgraced. The framers of our government have not constituted it with faculties to supervise coördinate departments and correct or prevent abuses of their authority. It cannot authenticate a statute; that power does not belong to it; nor can it keep the legislative journal. It ascertains the statute law by looking at its authentication, and then its function is merely to expound and administer it. It cannot, we think, look beyond that authentication, because of the constitution itself. If it may, then for the same reason it may go beyond the journal, when that is impeached; and so the validity of legislation may be made to depend upon the memory of witnesses, and no man can, in fact, know the law, which he is bound to obey. Such consequences would

be a large price to pay for immunity from the possible abuse of authority by the high officers who are, as we think, charged with the duty of certifying to the public the fact that a statute has been enacted by competent houses. Human governments must repose confidence in officers. It may be abused and there may be no remedy.

"Nor is there any great force in the argument which seems to be regarded as of weight by some American courts, that some important provision of the constitution would be a dead letter if inquiry may not be made by the courts beyond the rolls. This argument overlooks the fact that legislators are sworn to support the constitution, or else it assumes that they will willfully violate that oath. It is neither modest nor just for judges thus to impeach the integrity of another department of government, and to claim that the judiciary only will be faithful to its obligations."

In the State of California the courts have been upon both sides of the question. In the first case, *Fowler v. Peirce*, reported in 2 Cal. 165, it was held that the courts would go behind the enrolled act. But in *Sherman v. Story*, 30 Cal. 253, the court, after a most thorough consideration of the question in all its aspects, and in an opinion showing great research and learning, rendered by that distinguished jurist, Judge SAWYER, came to the conclusion that the enrolled act was conclusive, and overruled the former case. This case in our opinion is entitled to great weight, for although there has been an attempt to show that a different ruling would have obtained had the present constitution of California been in force, we are not satisfied that such would have been the case; for while it is true that the supreme court of that state since the adoption of its new constitution has gone back to its original position, the opinions in the cases in which it has done so show upon their face that they received no such consideration as did the one reported in 30 Cal. above cited. It is true that the distinguished jurist who wrote the opinion in *Sherman v. Story, supra*, afterwards, when holding a fed-

eral court, came to the conclusion that under the new con-
stitution of California the courts were authorized to go
behind the enrolled act, but we do not think that in the
latter case his reasoning at all compares with that in the
former, and it is probable that his mind was unconsciously
influenced by the fact that the legislation embodied in the
bill under consideration was so unjust that Judge FIELD,
of the supreme court, was willing to set it aside as being
in violation of the constitution of the United States. And
here it may be remarked that in the great majority of
cases in which the courts have held that they could go be-
hind the enrolled act, the legislation attacked has been of
such a vicious nature that the mind of any honest judge
would naturally seek some excuse by which its effect could
be destroyed.

The constitution of Pennsylvania had mandatory provi-
sions directed to its legislature of a pronounced type, and
yet the supreme court of that state, in a comparatively re-
cent decision, that of *Kilgore v. Magee*, 85 Pa. St. 401,
fully recognized the doctrine for which we are contending,
and, in its opinion therein rendered, made use of the fol-
lowing pertinent language:

"In regard to the passage of the law and the alleged
disregard of the forms of legislation required by the con-
stitution, we think the subject is not within the pale of
judicial inquiry. So far as the duty and the consciences
of the members of the legislature are involved, the law is
mandatory. They are bound by their oaths to obey the
constitutional mode of proceeding, and any intentional dis-
regard is a breach of duty and a violation of their oaths.
But when a law has been passed and approved and certified
in due form, it is no part of the duty of the judiciary to go
behind the law as duly certified to inquire into the observ-
ance of form in its passage. The presumption applies to
the act of passing the law, that applies generally to the
proceedings of anybody whose sole duty is to deal with the
subject. The presumption in favor of regularity is essen-

tial to the peace and order of the state. If every law could be contested in the courts on the ground of informality in its enactment, the floodgate of litigation would be opened so widely, society would be deluged in the flow."

In *Weeks v. Smith*, 81 Me. 538 (18 Atl. Rep. 325), the supreme court of that state, after a review of the authorities *pro* and *con*, decided that the enrolled act was conclusive upon the courts.

In *Pacific Railroad v. Governor*, 23 Mo. 353, the supreme court of that state, in sustaining the doctrine for which we are contending, made use of the following language:

"The constitution is designed to limit the powers of the government, and to confine each of the departments to its appropriate sphere. If the legislature exceed its powers in the enactment of a law, the courts, being sworn to support the constitution, must judge that law by the standard of the constitution, and declare its validity. But the question whether a law on its face violates the constitution, is very different from that growing out of the non-compliance with the forms required to be observed in its enactment. In the one case, a power is exercised, not delegated, or which is prohibited, and the question of the validity of the law is determined from the language of it. In the other, the law is not, in its terms, contrary to the constitution; on its face it is regular, but resort is had to something behind the law itself in order to ascertain whether the general assembly, in making the law, was governed by the rules prescribed for its action by the constitution. This would seem like an inquisition into the conduct of the members of the general assembly, and it must be seen at once that it is a very delicate power, the frequent exercise of which must lead to endless confusion in the administration of the law."

In *Scarborough v. Robinson*, 81 N. C. 409, this question in principle was passed upon, and the peculiar circumstances render it particularly pertinent to the question now under discussion. In that case an act had regularly passed

the legislature, but had failed to receive the signature of one of the presiding officers, and it was sought to give it force by proving the fact of its regular enactment otherwise than by the enrolled bill properly signed. The court held that this could not be done; that the enrolled bill was the final record of the legislature in the enactment of a law, and that such final record was the only thing of which the court could take notice.

The constitution of the State of Texas abounded in mandatory provisions of the most positive nature, directed to the legislature, yet in the recent case of *Ex parte Tipton*, 28 Tex. App. 438 (13 S. W. Rep. 610), it was held, after full consideration, that the courts could not go behind the enrolled act for any purpose whatever.

In *State v. Swift*, 10 Nev. 176, this question was fully considered, and in the opinion therein rendered the matter very ably argued, and the conclusion reached that enrolled bills are conclusive.

In addition to the above cases we have examined each. of the following cases and cite them as being directly in point upon the question which we are discussing: *People v. Burt*, 43 Cal. 560; *Standard Underground Cable Co. v. Attorney General*, 46 N. J. Eq. 270 (19 Atl. Rep. 733). And the following cases which though not so directly in point clearly sustain the principle for which we are contending: *Duncombe v. Prindle*, 12 Iowa, 1; *Clare v. State*, 5 Iowa, 509; *Eld v. Gorham*, 20 Conn. 8; *Warner v. Beers*, 23 Wend. 172; *Hunt v. Alstyne*, 25 Wend. 605; *People v. Devlin*, 33 N. Y. 269; *People v. Commissioners*, 54 N. Y. 276; *Fouke v. Fleming*, 13 Md. 392; *Bender v. State*, 53 Ind. 254; *Brodnax v. Groom*, 64 N. C. 244; *Freeholders v. Stevenson*, 46 N. J. Law, 173.

This citation of cases not only furnishes us abundant authority for holding that the enrolled acts are conclusive, but equally good reason for so holding appears in what has

been said by the courts in the states in which the contrary doctrine obtains. In recent opinions rendered in several cases in the courts of these states the judges, while recognizing the fact that the rule was so well settled there that they could not properly change it, have expressed regret that the rule which holds to the conclusiveness of such enrolled bills had not been adopted therein. Even in the state of Illinois, where the courts have established a rule of the utmost liberality as to their right to go behind the enrolled acts, the judge who pronounced the decision of the supreme court of that state in a comparatively recent case, that of *People v. Starne*, 35 Ill. 136, seems to clearly indicate that he regretted that a different rule had not been adopted by the courts of that state. If, in that state, which may be said to have been the leader upon that side of the question, even a doubt is expressed as to the policy of the rule there adopted, it is a fact so pertinent that it is entitled to great consideration when a rule upon this subject is to be first announced by the courts of a state.

In our opinion, authority, reason, public policy and convenience require us to hold that the enrolled bill on file, when fair upon its face, must be accepted without question by the courts as having been regularly enacted by the legislature. It follows that the act under consideration is a part of the statute law of the state, and that thereunder it was the duty of the respondent to have approved the bond of the relator, and, he having refused to perform this duty a peremptory writ of *mandamus* must issue requiring such action on his part.

DUNBAR, C. J., and SCOTT, ANDERS and STILES, JJ., concur.