[No. 20248.  Department Two.  October 9, 1926.]

THE STATE OF WASHINGTON, on the Relation of John
H. Dunbar, Plaintiff, v. STATE BOARD OF
EQUALIZATION et al., Respondents.[1]

[1] MANDAMUS (11, 30)—ACTS OF PUBLIC OFFICERS—STATE BOARDS.
Mandamus lies to compel state officers and boards to perform
the duties fixed by law, in which the constitutionality of the
law will be determined.

[2] STATES (7)—OFFICERS (2)—STATE BOARD OF EQUALIZATION. The
members of the state board of equalization are state officers,
and therefore subject to the original jurisdiction of the supreme
court in mandamus.

[3] ATTORNEY GENERAL (3)—MANDAMUS (72)—PARTIES PLAINTIFF.
The *Attorney General* is the proper party to institute proceed-
ings to compel the state board of equalization to perform the
duties enjoined by the acts of the legislators.

[4] MANDAMUS (70) — JURISDICTION — SUPREME COURT — STATE OF-
FICERS. Appropriations for the state's institutions of higher
learning are matters of public concern, entitling the supreme
court to take original jurisdiction of mandamus proceedings to
enforce the same.

[5] ATTORNEY GENERAL (3)—MANDAMUS (73)—PARTIES PLAINTIFF—
USE OF NAME OF STATE. Rem. Comp. Stat., § 112, subdiv. 3, mak-
ing it the duty of the *Attorney General* to defend all actions
against any state officer, does not relieve him of the duty to
institute proceedings against state officers recreant to their
trusts, to compel them to perform their duties.

[6] MANDAMUS (5)—REMEDY BY APPEAL—ACTS OF PUBLIC OFFICERS.
There is no speedy or adequate remedy by appeal where the
state board of equalization refuses to make a levy required by
law; and mandamus lies to compel performance of the duty;
though the state board of equalization sits as the tax commis-
sion, and Laws 1925, p. 95, § 7, authorizes an appeal from any
order of the tax commission; that act having no application to
acts as members of the board of equalization.

[7] STATUTES (2-1, 7, 8)—MODE OF ENACTMENT—DETERMINATION OF
VALIDITY—AUTHENTICATION—PRESUMPTION. The courts will not
go behind the face of the enrolled bill to determine the method,

[1]Reported in 249 Pac. 996.

procedure, means or manner in which it was passed by the houses of the legislature.

[8] SAME (2-1, 7, 8). The enrolled bill of Chapter 82, Laws of 1925, p. 95, appears, from the message to the secretary of state, signed by the secretary of the senate, on the face of the record to have been passed over the governor's veto on January 6th, 1926, and is therefore duly authenticated, although the certificate as to its passage over the veto was not signed by the presiding officer of either house, where the bill itself was so signed; in view of Const. art. II, § 32, providing that no bill shall become a law until so signed in open session, under such rules as the legislature may prescribe; and art. III, §12, requiring every act to be presented to the governor, and that, if vetoed and returned, it shall become a law if approved in both houses by two-thirds of the members present; it being presumed, in the absence of any record to the contrary, that its repassage was regular.

[9] SAME (59)—CONSTRUCTION—AMBIGUITY. There is no ambiguity in chapter 82, Laws 1925, p. 95, providing for a millage levy for the state institutions of higher education, based upon a certain valuation, by reason of the fact that such valuation was less than that fixed by the state board of equalization for the assessable property of the state; as the amount to be levied is but a matter of mathematical calculation.

Application filed in the supreme court September 27, 1926, for a writ of mandamus to compel the state board of equalization to make a tax levy for the support of the state educational institutions. Granted.

*The Attorney General* and *E. W. Anderson, Assistant,* for relators.

*Alex Winston* and *Roberts & Skeel,* for respondent.

*Chadwick, McMicken, Ramsey & Rupp, Shank, Belt & Fairbrook, Preston, Thorgrimson & Turner,* and *Wright, Froude, Allen & Hilen, amici curiae.*

MACKINTOSH, J.—The legislature of this state in 1921 passed an act which appears as chapter 142 of the Laws of 1921, p. 528, and provides that:

"The state board of equalization shall, beginning the fiscal year, 1921, and annually thereafter, at the time

of levying taxes for state purposes, levy upon all property subject to taxation, a tax of one and ten one hundredths of one mill (1.10) for the state university fund; sixty-seven one hundredths of one mill (.67) for the state college fund; twenty one hundredths of one mill (.20) for the Bellingham Normal School fund; fifteen and nine-tenths hundredths of one mill (.159) for the Cheney Normal School fund; and twelve one hundredths of one mill (.12) for the Ellensburg Normal School fund.

"It shall be the duty of the joint board of higher curricula in the report to be made next preceding the convening of the legislature in 1925 to recommend any changes in levy herein provided for which the said board may deem necessary or proper, and to give their specific grounds and reasons therefor, for the purpose of having the levy herein provided for readjusted by the legislature of 1925."

The legislature of 1925 passed chapter 82 of the Laws of 1925, p. 95, repealing chapter 142 of the Laws of 1921, p. 528, the new provision reading:

"The state tax commission shall, beginning the fiscal year 1926, and annually thereafter, at the time of levying taxes for state purposes, levy upon all property subject to taxation, a tax of one and forty-seven one-hundredths of one mill (1.47) for the state university fund; eight thousand seven hundred forty-six ten-thousandths of one mill (.8746) for the state college fund; twenty-six one-hundredths of one mill (.26) for the Bellingham Normal School fund; twenty-two one-hundredths of one mill (.22) for the Cheney Normal School fund; and sixteen one-hundredths of one mill (.16) for the Ellensburg Normal School fund, upon one billion, one hundred fifty-eight million, twenty-six thousand, six hundred seventy-six dollars, ($1,158,026,676.00).

"Sec. 2.    That chapter 142 of the Laws of 1921, page 528, be and the same is hereby repealed."

Thereafter, and in September, 1926, the state board of equalization, disregarding the act of 1925, proceeded

to make a levy upon the property subject to taxation in this state, according to the provisions of the Laws of 1921, p. 528. Thereupon this action was begun by the state, on the relation of the *Attorney General*, against the board of equalization, to compel it to make a levy in accordance with the mandate of the 1925 statute. The objection of the respondents to the issuance of the writ of mandate divides itself into three major classifications: (First) that the action is improperly brought in this court; (second) that chapter 82 of the Laws of 1925, p. 95, is invalid because not properly authenticated; and (third) that that chapter is invalid because of ambiguity.

(I)    The first objection to the proceeding may be divided under several heads:

[1]    (*a*)    It is urged that generally mandamus is not a proper remedy. The answer to this was adequately given in the decision in *State ex rel. Davis-Smith Co. v. Clausen*, 65 Wash. 156, 117 Pac. 1101, 37 L. R. A. (N. S.) 466, 2 N. C. C. A823, 3 N. C. C. A599, where there was thoroughly reviewed the power of the court to issue mandamus against officials to compel the performance of a duty imposed upon them by statute, and where it was held that the validity of such a statute can be considered in the mandamus action.

[2]    (*b*)    It is urged that the respondents are not state officers and therefore not subject to the writ sought. Section 4, art. IV, state constitution. This court, several times in considering whether persons occupying different positions in connection with the state and municipal governments were public officers, has held that persons exercising functions analogous to those exercised by the respondents here were public officers. In *State v. Womack*, 4 Wash. 19, 29 Pac. 939, it was held that a member of the board of education

was a public officer and that that term was not confined to such officers of the state as are mentioned in the constitution. It was said that the members of the board of education "are certainly public officers under any definition that can be found of the term public officer." In *Olympia Water Works v. Thurston County,* 14 Wash. 268, 44 Pac. 267, it was held that members of county boards of equalization were public officers. In *Lewis v. Bishop,* 19 Wash. 312, 53 Pac. 165, the same decision was arrived at. In *State ex rel. Cowles v. Shively,* 63 Wash. 103, 114 Pac. 901, the state insurance commissioner, a person whose office was created by the state legislature, was held to be a state officer. In *State ex rel. North Coast Fire Insurance Co. v. Schively,* 68 Wash. 148, 122 Pac. 1020, this same office was again held to be a state office and its occupant a state officer, and the early case of *State ex rel. Stearns v. Smith,* 6 Wash. 496, 33 Pac. 974, which held that a member of the board of regents of the agricultural college was not a state officer, was criticized and in effect overruled. In *State ex rel. Davis v. Johns,* 139 Wash. 525, 248 Pac. 423, the office of regent of the state university was held to be a state office. It was said in *Blue v. Tetrick,* 69 W. Va. 742, 72 S. E. 1033:

"It is clear that a tax commissioner holds an office, and the constitution authorizes the legislature to create an office. The constitution goes further than merely to authorize the legislature to create an employment; it authorizes it to create an office. The tax commissioner is an officer, paid out of the public treasury, and exercises some great powers pertaining to sovereignty, and is therefore an officer, not an employe."

A state office exists where there is reposed some part of the state's sovereign power and the levying of taxes is a sovereign power. The examination of a many-page note to the case of *Shelby v. Alcorn,* 36 Miss. 273,

72 Am. Dec. 169, leaves no question as to the respondents' status. It would therefore appear that this court has original jurisdiction in mandamus over the respondents.

[3] (c)   The next objection presented to the action is that the *Attorney General* is not a proper party to institute and maintain it. In *Jones v. Reed*, 3 Wash. 57, 27 Pac. 1067, it was held that the attorney general was the proper party to enjoin the misapplication of funds appropriated by the legislature for the purpose of establishing an agricultural school, and that that officer was the only one who could maintain such action. In *State ex rel. Attorney General v. Seattle Gas & Electric Co.*, 28 Wash. 488, 68 Pac. 946, 70 Pac. 114, it was held that the *Attorney General* was not a proper party to maintain a *quo warranto* proceeding to inquire into the wrongful exercise of a franchise granted by a municipality. It was there held that the *Attorney General* did not have common law powers and had no authority to institute an action concerning merely a local question which did not affect generally the citizens of the state, and it was also pointed out that the prosecuting attorneys of the several counties were given the power expressly to institute such proceedings. In *Jones v. Reed, supra,* and *State ex rel. Pierce County v. Superior Court,* 86 Wash. 685, 151 Pac. 108, this court held that the *Attorney General* is the only party who under the law can maintain an action to prevent public funds being improperly used. It would seem that, if the *Attorney General* is the only proper party to prevent the misappropriation of public funds, he should be a proper party to compel their proper use. If this is not so there would be no one empowered to institute an action to compel state officials to use appropriated funds in the manner directed by the state legislature.

Under Rem. Comp. Stat., § 112 [P. C. § 6579], it is made the duty of the *Attorney General* to institute and prosecute actions which may be necessary in the execution of the duties of any state officer, and it having been made the duty of the respondents by chapter 82 of the Laws of 1925, p. 95, to levy certain taxes, it would seem to follow that it was the duty of the *Attorney General* to institute and prosecute such action as may be necessary to see that those duties were properly performed. Furthermore, Rem. Comp. Stat., § 11032 [P. C. § 1937], makes it the duty of the *Attorney General* to enforce the proper application of funds appropriated to the public institutions of the state. The educational institutions are public institutions of the state, and although the funds here may not strictly be said to have been appropriated, yet that word as used in this section should not be given that narrow and restricted meaning, but the intent of the act should be observed, which is that the *Attorney General* should see to the enforcement of an act which was intended to provide funds for the carrying on of state institutions.

[4] (*d*) The further argument is made that mandamus will not be granted in this court unless the matter under examination is one of state concern. This court has held, in *State ex rel. Ottesen v. Clausen,* 124 Wash. 389, 214 Pac. 635, *State ex rel. Goodwin v. Savidge,* 133 Wash. 532, 234 Pac. 1, and in *State ex rel. Van Brocklyn v. Savidge, ante* p. 361, 249 Pac. 996, that mandamus will not issue originally out of the supreme court against a state officer to secure to the relator a purely private right. The first of these actions was to compel the payment of a balance due under a road building contract; the second and third were actions seeking to compel the issuance of mining and gas leases. It would hardly seem necessary to discuss the question of whether appropriations for the five institu-

tions of higher learning present a matter of more than private interest and concern. The furnishing of higher educational facilities to the youth of the state has at all times been considered a matter of public and state concern, and an application to secure that which was allotted to those institutions by the state legislature can not be denied on the ground that merely private rights are involved and that the relator should be deprived of the opportunity of originally presenting the issue to this tribunal.

[5] (e) Contention is made that the *Attorney General* is compelled, under the constitution and statutes, to represent state officers, and that therefore he can not begin an action wherein state officers are defendants. Attention is called to Rem. Comp. Stat., § 112, subd. 3, where it is made the duty of the *Attorney General* to defend all actions against any state officer. The legitimate conclusion of such an argument is that the *Attorney General* must, if such a situation arise, sit supinely by and allow state officers to violate their duties and be recreant to their trusts, and that instead of preventing such actions it is his duty to defend the delinquents. The law can not be given any such construction. His paramount duty is made the protection of the interest of the people of the state and, where he is cognizant of violations of the constitution or the statutes by a state officer, his duty is to obstruct and not to assist; and where the interests of the public are antagonistic to those of state officers, or where state officers may conflict among themselves, it is impossible and improper for the *Attorney General* to defend such state officers. This court, in *State ex rel. Dysart v. Gage,* 107 Wash. 282, 181 Pac. 855, recognized that such situations might arise and held that where a prosecuting attorney, although made the legal adviser

of all school districts, could not properly represent antagonistic interests of districts involved in litigation, private counsel would have to be employed by those officers whose actions were being questioned.

[6]  (f)  The point is raised that mandamus will not lie for the reason that there is an adequate remedy by appeal.   This point was sustained in *State ex rel. Brunn v. State Board of Medical Examiners,* 61 Wash. 623, 112 Pac. 746, where the question involved was the right to a license to practice medicine, and in *Russell v. Dibble,* 132 Wash. 51, 231 Pac. 18, where the same question was had.   In *State ex rel. Hawksworth v. Clifford,* 130 Wash. 103, 226 Pac. 272, compensation under the workmen's compensation act was not fixed by the court by writ for the reason that the act itself set out a method of appeal.   But this court has held that in questions arising before county boards of equalization, no appeal having been provided for, extraordinary writs were proper.   *Olympia Water Works v. Thurston County,* 14 Wash. 268, 44 Pac. 267; *Lewis v. Bishop,* 19 Wash. 312, 53 Pac. 165; *Adams County v. Scott,* 117 Wash. 85, 200 Pac. 1112.

There is no logical or practical difference between the functions of county boards of equalization and the state board of equalization, and unless there is some provision of law granting an appeal from the action of the state board of equalization in matters such as here in controversy, mandamus is the remedy to be sought. That there is such provision for an appeal, is contended for by the respondents.   They claim that chapter 18 of the Laws of 1925, p. 95, creating the tax commission and making its members the state board of equalization, provides an appellate procedure.   Section 7 of that act specifies that any party feeling aggrieved by "any order of the tax commission shall have a right of ap-

peal to the superior court'' etc., but an examination of
the chapter clearly indicates that the men composing
the tax commission, although they are the same ones
who also compose the board of equalization, occupy two
different positions; and this appeal section relates to
their actions when sitting as a tax commission and not
as equalizers making levy under statutory mandate.
Not only does the act restrict the right of appeal to
questions arising before the tax commission, but from
the very nature of the duties of these men, an appeal
was not contemplated from the action of the board of
equalization when proceeding under a statute such as
either chapter 142 of the Laws of 1921, p. 528, or
chapter 82 of the Laws of 1925, p. 95. Although the
later act refers to the tax commission, it plainly means
the members of that commission sitting as the board
of equalization. Rem. Comp. Stat., § 11222 [P. C.
§ 7020]; Laws of 1925, p. 33, § 11. Moreover, even
though an appeal might have been provided for, it is
neither speedy nor adequate. It is unnecessary to go
into the exigencies of a matter of this kind. The pro-
vision for the levying and collection of a tax for the
maintenance of public institutions is a matter which
can not be adequately and speedily determined in the
regular course of appeal.

[7]    (II.)    Under this head is presented the argu-
ment that the enrolled bill on file in the office of the
secretary of state, appearing as chapter 82 of the Laws
of 1925, p. 95, is invalid because not properly authen-
ticated. This court early adopted and ever since has
adhered to the rule that it will not go behind an en-
rolled bill as it appears in the secretary of state's of-
fice to determine the method, the procedure, the means
or manner in which it was passed in the houses of the
legislature. After a most thorough examination of the

two opposing theories, this one was finally adopted, and the one obtaining in several jurisdictions that journal entries and independent investigations may be resorted to for the purpose of determining whether an enrolled bill was actually passed as enrolled was repudiated. The rule in this state is not only sustained by long-continued acceptance, but is based upon sound logical and practical reasoning. That the enrolled bill rule is the rule in this state appears not only from the decided cases (*State ex rel. Reed v. Jones,* 6 Wash. 452, 34 Pac. 201, 23 L. R. A. 340; *Parmeter v. Bourne,* 8 Wash. 45, 35 Pac. 586; *Gottstein v. Lister,* 88 Wash. 462, 153 Pac. 595, Ann. Cas. 1917D 1008), but it is so conceded in the argument by respondents' counsel, and therefore there is eliminated from consideration in this case considerable matter in the briefs relating to the manner in which chapter 82 of the Laws of 1925, p. 95, was passed over the governor's veto by the house of representatives. All those things, under the concession made by the respondents' counsel themselves, are immaterial and not subject to investigation by the court. Finding an enrolled bill in the office of the secretary of state, unless that bill carries its death warrant in its hand, the courts will make no investigation of the antecedent history connected with its passage, except as such an investigation may be necessary in case of ambiguity in the bill for the purpose of determining the legislative intent. *Scouten v. Whatcom,* 33 Wash. 273, 74 Pac. 389. As chief justice Dunbar, in *Parmeter v. Bourne, supra,* said for this court:

"This argument is squarely against the decision in *State ex rel. Reed v. Jones,* 6 Wash. 452 (34 Pac. 201), where this court held that, where an act of the legislature had been properly certified, courts had no authority to inquire into any prior proceedings on the

part of the legislature to ascertain whether the mandatory provisions of the constitution had been complied with, but that the enrolled bill properly certified to was conclusive evidence of that question. This decision was based upon the theory that the legislature was one of the coordinate departments of the government, with equal authority with the others, and that the assumption is a false one, that the 'mandatory provisions of the constitution are safer if the enforcement thereof is entrusted to the judicial department than if so entrusted to the legislature.' Or, 'in other words,' said this court, 'courts holding the other view have acted upon the presumption that their department is the only one in which sufficient integrity exists to insure the preservation of the constitution.' ''

[8] The question then, and the only question relating to the validity of this bill, is whether upon its face it is regular. The bill shows that it bears these indorsements:

"Passed the Senate December 7, 1925.
E. J. Cleary,
President of the Senate.
Passed the House December 18, 1925.
F. B. Danskin,
Speaker of the House.
"Vetoed December 24, 1925.
"Roland H. Hartley,
"Governor of Washington
"MESSAGE TO THE SECRETARY OF STATE
"Senate Chamber, Olympia, Washington, January 6, 1926.
"Hon. J. Grant Hinkle
"Secretary of State.
"Sir: The legislature of the state of Washington has passed notwithstanding the veto of the governor, Senate Bill No. 40, entitled: 'AN ACT relating to the state institutions of higher education, making provisions for the annual levy of a tax to produce revenue therefor and repealing chapter 142 of the Laws of 1921, page 528.'

"And said bill, together with the governor's veto message on same, is herewith transmitted.

"Victor Zednick,
"Secretary of the Senate.
"FILED Jan. 7, 1926, 11:00 A. M.
"J. GRANT HINKLE,
"Secretary of State."

Respondents' position is that this is not a sufficient authentication for the reason that after the bill had been vetoed by the governor and returned to the legislature the signatures of the president of the senate and speaker of the house do not appear; in other words, the claim is that, after a bill has been vetoed, it is incumbent that the president of the senate and speaker of the house sign the bill as under the law they are obliged to do bills on original passage. Let us examine the provisions of the constitution relating to this phase of the matter. Section 32 of art. II of the constitution provides:

"No bill shall become a law until the same shall have been signed by the presiding officer of each of the two houses in open session, and under such rules as the legislature shall prescribe."

Section 12, art. III of the constitution is as follows:

"Every act which shall have passed the legislature shall be, before it becomes a law, presented to the governor. If he approves, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated, which house shall enter the objections at large upon the journal, and proceed to reconsider. If, after such reconsideration, two-thirds of the members present shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and if approved by two-thirds of the members present, *it shall become a law;* . . ."

An examination of these sections shows that it is mandatory that the presiding officers of the two houses

of the legislature shall sign the bill upon its original passage, but that there is no provision for such signature upon a repassage after veto; that, after a veto, *"it shall become a law"* when two-thirds of the members of each house have voted to pass it over the governor's veto. The way is left open for the legislature to provide by rule for the manner of authentication. There is no question that if the constitution had provided, upon a repassage of a vetoed bill, that the designated officers should sign it, the absence of such signature on the enrolled bill in the secretary of state's office would render that bill invalid; but, in the absence of any constitutional provision relating to this matter, the legislature under its inherent power has the right to adopt any procedure that it sees fit by which to transmit to the secretary of state the information that the bill has been finally passed and present the enrolled bill to that office for filing.

The decisions cited by the respondents: *Amos v. Gunn,* 84 Fla. 285, 94 So. 615; *Hamlett v. McCreary,* 153 Ky. 755, 156 S. W. 410; *State v. Kiesewetter,* 45 Ohio 254, 12 N. E. 807; *Scarborough v. Robinson,* 81 N. C. 409; *Lynch v. Hutchinson,* 219 Ill. 193, 76 N. E. 370; *State ex rel. McClay v. Mickey,* 73 Neb. 281, 102 N. W. 679; *State v. Lynch,* 169 Iowa 148, 151 N. W. 81; are all decisions from which there can be no dissent, and involve only the question of the validity of a bill on its original passage not authenticated by the signature of either one or both the presiding officers of the two houses of the legislature, where there was an express constitutional provision that a bill should be so authenticated.

In none of those cases was the question involved whether an authentication was necessary upon a repassage of a bill, but respondents cite *State ex rel. Coffin v. Howell,* 26 Nev. 93, 64 Pac. 466, where the su-

preme court of Nevada held that under a constitutional provision requiring that all bills passed by the legislature should be signed by the presiding officers of the house and senate, where the governor had vetoed the bill after adjournment of the legislature and the subsequent legislature repassed it over the veto, the failure of the presiding officers of the subsequent legislature to sign the bill rendered the law invalid and that the constitutional provision applied to the repassage of bills over the governor's veto. Two judges of the court signed the opinion and one dissented.

That seems to be the sole authority in favor of the respondents' position, but opposed to it we find the decisions of the court of appeals of Kentucky, of the supreme court of Missouri and of the supreme court of Indiana. In *State ex rel. Holt v. Denny,* 4 L. R. A. 65, the last-mentioned court held that an attestation of a bill as required by the Indiana constitution on its original passage was not required to be made a second time after it had been passed over the veto of the governor. This question was thoroughly analyzed and considered and the conclusion made that under a constitutional provision such as the one obtaining in this state there was no requirement for a second attestation for the reason that the constitution provides that the repassage having been made by a two-thirds vote the bill *"shall become a law"* and that there the matter ends. The same court in *Evansville v. State of Indiana ex rel. Blend,* 4 L. R. A. 93, said that where a bill which had originated in the house of representatives and had been passed by both branches of the legislature and vetoed by the governor, had been returned to the house where it originated and repassed and then sent to the senate and repassed, "the moment it passed the senate it became a law." And this under a constitutional provision which reads as does ours:

" 'Every bill which shall have passed the General Assembly shall be presented to the Governor; if he approve he shall sign it; but if not he shall return it, with his objections, to the House in which it shall have originated, which House shall enter the objections at large upon its journals and proceed to reconsider the bill. If, after such reconsideration, a majority of all the members elected to that House shall agree to pass the bill, it shall be sent, with the Governor's objections, to the other House, by which it shall likewise be reconsidered, and if approved by a majority of all members elected to that House it shall be a law.' "

The Kentucky court said, in *Perkins v. Lucas,* 197 Kentucky 1, 246 S. W. 150:

"No endorsement was made upon the enrolled bill, nor signed by the presiding officer of either house, to the effect that the bill had been passed over the governor's veto, and this, plaintiff insists, must have been done to make it a valid measure. It is well established in this jurisdiction that when an enrolled bill has been attested by the presiding officers of each house, respectively, as section 56 of the constitution requires, it will be accepted by the courts as the actual bill which was passed, and the courts will not go behind that certification to determine whether all the requirements of the constitution have been complied with in the passage of the bill, nor will they look to the entries in the journals to determine that fact, nor allow such entries to overthrow the presumption that the steps taken in the passage of the bill were regular and in conformity to the constitutional requirements. The reason for this exclusive presumption in favor of the regularity of the passage of the bill from the attestation of the presiding officers of the two houses, is that a bill when made ready to be presented to the Governor must have the certificates of the presiding officers of the two houses of the Assembly upon it, and the courts will not go behind this certification to consider the regularity of its passage, out of regard to the equality of the legislative branch of the government with that of the judiciary. *Duncan v. Combs,* 131 Ky. 330;

*Hamlett v. McCreary,* 153 Ky. 754; *Combe v. State Board of Charities, etc.,* 190 Ky. 147; *Lafferty v. Huffman,* 99 Ky. 92; *Commth. v. Shelton,* 99 Ky. 122; *Wilson v. Hinds,* 99 Ky. 228; *Vogt v. Beauchamp,* 153 Ky. 67. When a bill, thus certified, has been disapproved by the governor and returned to the house in which it originated, another constitutional provision governs. Section 88 of the constitution provides in substance that if the governor disapproves a bill, he shall return it with his objections to the house in which it originated, which shall enter the objections in full upon its journals, and reconsider it. Upon the reconsideration, if a majority of all the members elected to that house shall agree to pass the bill, it shall be sent with the governor's objections to the other house, which shall consider it in like manner, and if approved by a majority of all the members elected to that house, 'it shall be law,' and in such cases the votes of both houses shall be determined by yeas and nays, and the names of the members voting for and against the bill shall be entered upon the journal of each house respectively. It will be observed that in this state of case no certification is required by the presiding officers of the houses, nor any other officer or individual, nor is any one required to sign the bill in any way. . . ."

The Missouri supreme court said this in *Pacific Railroad v. The Governor,* 66 Am. Dec. 673 (681):

"That instrument [the Missouri constitution] provides that every bill, having passed both houses, shall be signed by the speaker of the house of representatives and by the president of the senate. This is the mode adopted for the authentication of every bill, and furnishes the evidence of its passage by the two houses in the first instance. The governor's signature to a bill is not required as a means or part of its authentication, but as evidence of his approval. The governor, being no member of either house, and in contemplation of the constitution not being present during their deliberations, could not know whether a bill had passed

the two houses or not. The constitution itself contemplated that there might be laws without the signature of the governor, and therefore the mode of authentication adopted was the evidence of the passage of all bills, in the first instance, by two houses, as well those passed with his approbation as those passed against his consent."

The legislature, not being hampered by any constitutional limitation regarding the attestation of repassed bills, as already said, has the power to make such rules or adopt such procedure as in its wisdom appeared best in the handling of the enrollment of such a bill, and there appears in this record an affidavit, unobjected to and uncontroverted, from the secretary of state, showing that it has been the custom of the legislature since the establishment of the state to attest the repassage of a bill in the manner as shown on the face of this bill, either by the secretary of the senate or the clerk of the house, according as to whether the bill originated in one or the other of those bodies. There must be, therefore, a conclusive presumption that this procedure is in accordance with a legislative rule and the power of the legislature to make such rule and compliance with it renders the action valid and the bill becomes an existing and effective law. Furthermore, in the absence of any showing to the contrary, the presumption is that the acts of officials are in accordance with the rules governing them and that regular procedure has been followed. *Schweizer v. Territory,* 5 Okl. 297, 47 Pac. 1094; *St. Louis & S. F. Ry. Co. v. Gill,* 54 Ark. 101, 15 S. W. 18.

And even if the rule of procedure had not been strictly followed, that would not violate the act, for, as was said in *Pacific Railroad v. The Governor, supra:*

. ''Upon the whole, we are of the opinion that the objections taken against the mode of passing this law by the general assembly on its reconsideration are untenable; that the constitution and law precludes an inquiry as to the existence of such objections, the constitution regarding the provisions alleged to have been violated in the passage of this law as merely directory, and being so a departure from them, even if there was a departure, would not render the law void.''

There appearing nothing upon this enrolled bill which shows that it was repassed irregularly, there is therefore nothing from which to reach a conclusion that the bill is other than valid.

[9] (III.) Some suggestion is made that chapter 82, Laws of 1925, p. 95, is void by reason of ambiguity; it appearing that the assessed valuation of the property of the state fixed by the board of equalization was in the sum of $1,207,621,657; and chapter 82, providing for a certain millage upon a lesser valuation renders the act invalid. There is no ambiguity in the act. The act plainly provides for a certain millage upon a certain valuation; in other words the act fixes an absolute amount to be provided for the maintenance of these five institutions. It is but a matter of mathematical computation to figure what that amount is. If the state board of equalization fixes the assessed value of the property of the state for taxation at one billion dollars, or two billion, or any other amount, the amount to be levied for these institutions is to be collected upon the basis of the valuation fixed by the board. That entails nothing but a simple arithmetical process; while it might have been simpler for the legislature to have originally done its own multiplying and fixed in the act the exact amount, it was not compelled to adopt that easier method, but could adopt the one which it has, and because it has chosen a more indirect

way of arriving at a result, rather than the direct way, presents no reason for holding that the act is thereby rendered ambiguous. If legislative acts are to be held invalid for the reason that they are ambiguous merely because they contain more words than may have been necessary to express the legislative intent, many virtuous enactments would have to be annulled.

Finding no merit in any of the contentions of the respondents, the writ will issue, directing them to comply with the requirements of chapter 82 of the Laws of 1925, p. 95. On account of the necessity of an immediate determination of this matter in the public interest the writ will issue instanter.

PARKER, MITCHELL, MAIN, and ASKREN, JJ., concur.