# DECISIONS

## OF THE

# Court of Appeals of Kentucky

## Perkins v. Lucas, et al.

### (Decided June 28, 1922.)

### Franklin Circuit Court

### Motion to Grant Interlocutory Injunction

1. Statutes—Attestation of Act by Presiding Officers of Each House —Entries in Journal.—An act of the legislature attested by the presiding officer of each house of the assembly, as required by section 56 of the Constitution, will be accepted by the courts as the bill which was actually passed, and the courts will not go behind the certification to determine whether all the constitutional requirements have been complied with, nor will the entries in the journals be looked to or allowed to overthrow the presumption in favor of its regularity.

2. Statutes—Attestation by Presiding Officers of Each House.— When a bill properly attested by the presiding officers of each branch of the assembly is presented to the Governor for his approval, then section 88 of. the Constitution governs, and if the bill is returned, with the disapproval of the Governor, it becomes a law if a majority of the members elected to each house shall agree to pass the bill, the Governor's objections to the contrary notwithstanding, and such proceedings are shown by the journals of the two houses, and are looked to as. the evidence of the passage of the bill over the veto of the Governor.

3. Statutes—Elections—Finding of Purgators.—The two purgators provided for by section 10, chapter 138, Session Acts, 1922, is not a court within the meaning of section 135 of the Constitution, because if the voter agrees to their decision it is mere arbitration,

and if the voter does not agree to the finding of the purgators, he is not bound by it, and the case is then tried and determined by one of the judges of an established court.

4. Elections—Registration.—Under section 147 of the Constitution, the legislature has the power to require all voters to register, and when same has been done, no one is a legal voter unless registered, and to this extent the legislature has the power to add to the qualifications of voters.

5. Elections—Constitutional Law—Right of Suffrage and Regulation Thereof.—Section 6 of the Constitution, which provides that "All elections shall be free and equal" is a guarantee to the citizen, that if he is a legal voter, he can freely vote for whom and for what he may choose, and that his vote, when cast, shall be equal in effect to the vote of any other citizen.

6. Elections—Registration.—All the courts hold that the provisions of registration laws must be reasonable, uniform and impartial, and must not deny or abridge the constitutional right of suffrage, nor unnecessarily impede the right, and if they transgress in those respects, the transgressions are fatal to the validity of the laws.

O'REAR, FOWLER & WALLACE for plaintiff.

HAZELRIGG & HAZELRIGG, ELWOOD HAMILTON and CHARLES H. MORRIS for defendants.

Opinion by Chief Justice Hurt—Granting interlocutory injunction.*

In this action which is pending in the above styled circuit court, a motion was made before the judge of that court to grant an interlocutory injunction to restrain the members of the election commission and the clerk of the county court from putting into operation the provisions of chapter 138, Session Acts, 1922, or exercising any of the duties imposed upon them under that chapter, which is ordinarily called the Registration Law. The injunction was denied, and plaintiff has submitted it to me, under the provisions of sections 296 and 297 of the Civil Code, with a motion to grant such an injunction and to direct the circuit court or judge to order such an injunction. The motion is based upon the contention that the act is void, because the manner of its enactment did not conform to the provisions of the Constitution upon the subject of the enactment of legislation; and further, that its requirements are contrary to other provisions of the Constitution which render it void. The first ob-

*While this is an opinion by Chief Justice Hurt upon a motion for an interlocutory order, its publication is directed by the court.

jection going to the validity of the entire act will be first considered.

(a)   It is admitted that the General Assembly in the enactment of the act conformed to all the requirements of Section 56 of the Constitution, which prescribes the manner of enacting a statute, and the steps necessary up to the time of its presentation to the Governor for his approval or disapproval.   The enrolled bill was signed by the presiding officers of the Senate and House, and presented to the Governor. The Governor declined to approve or sign the bill and returned it to the House in which it originated with his objections.   The objections were entered upon the journal, and the bill reconsidered. The same proceedings were had in the other House, when it was transmitted to it.   Upon the reconsideration a majority of the membership of each House, by a yea and nay vote, which was entered upon the journals of each House, respectively, agreed to pass the bill, the objections of the Governor to the contrary notwithstanding. No endorsement was made upon the enrolled bill, nor signed by the presiding officer of either House, to the effect that the bill had been passed over the Governor's veto, and this, plaintiff insists, must have been done to make it a valid measure.   It is well established in this jurisdiction that when an enrolled bill has been attested by the presiding officers of each House, respectively, as Section 56 of the Constitution requires, it will be accepted by the courts as the actual bill which was passed, and the courts will not go behind that certification to determine whether all the requirements of the constitution have been complied with in the passage of the bill, nor will they look to the entries in the journals to determine that fact, nor allow such entries to overthrow the presumption that the steps taken in the passage of the bill were regular and in conformity to the constitutional requirements.   The reason for this exclusive presumption in favor of the regularity of the passage of the bill from the attestation of the presiding officers of the two Houses, is that a bill when made ready to be presented to the Governor must have the certificates of the presiding officers of the two Houses of the Assembly upon it, and the courts will not go behind this certification to consider the regularity of its passage, out of regard to the equality of the legislative branch of the government with that of the judiciary.   Duncan v. Combs,

131 Ky. 330; Hamlett v. McCreary, 153 Ky. 754; Combe v. State Board of Charities, etc., 190 Ky. 147; Lafferty v. Huffman, 99 Ky. 92; Commth. v. Shelton, 99 Ky. 122; Wilson v. Hinds, 99 Ky. 228; Vogt v. Beauchamp, 153 Ky. 67. When a bill, thus certified, has been disapproved by the Governor and returned to the House in which it originated, another constitutional provision governs. Section 88 of the Constitution provides in substance that if the Governor disapproves a bill, he shall return it with his objections to the House in which it originated, which shall enter the objections in full upon its journals, and reconsider it. Upon the reconsideration, if a majority of all the members elected to that House shall agree to pass the bill, it shall be sent with the Governor's objections to the other House, which shall consider it in like manner, and if approved by a majority of all the members elected to that House "it shall be law," and in such cases the votes of both Houses shall be determined by yeas and nays, and the names of the members voting for and against the bill shall be entered upon the journal of each House respectively. It will be observed that in this state of case no certification is required by the presiding officers of the Houses, nor any other officer or individual, nor is any one required to sign the bill in any way. The journal is required to show the proceedings, and there is no evidence of the fact that the bill has become a law, except the contents of the journals, and they must necessarily be looked to to establish the truth and the facts, and they thereby become competent evidence as to what occurred.

The Constitution of Indiana contains provisions similar to sections 56 and 88 of our Constitution, and the Supreme Court of that state having before it a similar question to the one here raised, said:

"If the Constitution required an attestation by the presiding officers after its passage over the Governor's objections, as it does in the case of an original passage of bills before presentation to the Governor, then such certificate would be proper and conclusive evidence of the passage, but as we have stated vetoed bills are not required to be so certified, and there is no record or evidence of such passage required to be kept, except the journals of the two Houses." The Constitution of that state like ours provides that in a case of a vetoed bill being passed over the veto of the Governor, in the manner

provided, it shall become a law.   This holding by the Indiana Supreme Court was in the case of Indiana, etc. v. Denny, 118 Ind. 449; and a similar conclusion was reached by the same court in Evansville v. State, 118 Ind. 426.   A different conclusion was reached by the Nevada Supreme Court, under a much similar state of facts, but the better reason it is evident is with the Indiana court.

(b)   Section 10 of the act provides for the appointment of two purgators by the election commissioners, whose duties it shall be to investigate the right to vote of any person who is registered, and whose right to vote is challenged, and after notice to the voter, to hear such evidence as may be offered, and if they agree, that such person is not a legal voter to strike his name from the registration book.   The plaintiff insists that this section is violative of section 135 of the Constitution, which provides that: ''No courts save those provided for in this Constitution shall be established.'' This contention I do not think is tenable.   Although the purgators may agree that the person is illegally registered and not entitled to vote, this conclusion of theirs does not deprive the person of the right of suffrage.   The statute provides that he may appeal to the circuit judge, and the decision of that judge shall be controlling in the matter.   If the purgators disagree in opinion, the case of the voter is certified to the circuit clerk, who, after the voter is summoned to answer the charge of being illegally upon the registration book, assigns the action to a circuit judge, who must decide the controversy, and the name of the person is retained upon the registration book as a voter, or stricken therefrom as the judge decides.  If the name of a person is stricken from the register by the purgators, and he fails to appeal, it is an agreement between the purgators and the person that the latter is not a legal voter, and amounts to no more than an arbitration.  The purgators do not perform a judicial function, and their body is not a court in the sense of the Constitution, but is an agency created by the legislature to assist the courts in the gathering of facts, and the disposition of such matters as about which the parties may agree, but they cannot eliminate any voter from the registration list, except by agreement.   Green v. Caldwell, 170 Ky. 571; L. & N. R. Co. v. Greenbrier Distillery Co. 170 Ky. 786.

(c)  It is objected that in section 2 of the act, the qualifications for a constitutional officer are prescribed other than those prescribed by the Constitution, in that it provides that a registration officer shall not be eligible to hold an office for one year from the first day of July, following his appointment.  I will not undertake to decide whether such contention is or is not sound, as the attempt to make a registration officer ineligible to hold office for one year from his appointment would not affect the validity of the act in the purpose for which it was enacted, or interfere with the execution of its provisions.

(d)  It is further contended that the act is unconstitutional, because it prescribes qualifications of voters in addition to and other than those prescribed by the Constitution.  If the contention is sound, the act, as a matter of course, can not be upheld.  Section 145 of the Constitution prescribes the qualifications of a voter to be a citizen of the United States of the age of twenty-one years, who has resided in the state for one year, in the county for six months, and in the precinct in which he purposes to vote for sixty days preceding the election, subject to certain exceptions which need not be mentioned.  These, however, are not all the qualifications which the Constitution prescribes under certain conditions.  Section 147 of that instrument provides that: ''The General Assembly shall provide by law for the registration of all persons entitled to vote in cities and towns having a population of five thousand or more; and may provide by general law for the registration of other voters in the state.  Where registration is required, only persons registered shall have the right to vote.  The mode of registration shall be prescribed by the General Assembly.''

The latter section of the Constitution having invested the legislature with power to require the registration of all voters and the mode of the registration, and explicitly provides that where registration is required ''only persons registered shall have the right to vote,'' it is clear, that if registration is provided for by law which is not obnoxious to the Constitution, a qualification is added to the voter which is not necessary for him to have where registration is not required.  Hence if the act assailed is not invalid, because violative of a constitutional guaranty regarding the right of suffrage, and while it does not add to the voters outside of the area where the Constitution mandatorily requires registration another qual-

ification, it does make an addition of a qualification authorized by the Constitution, and an act requiring registration is not invalid on that account. Hence for all the foregoing objections, the act would be upheld.

(e) It is insisted, however, that the act is in violation of section 6 of the Constitution which provides that: "All elections shall be free and equal."

This is a constitutional guarantee to the citizen that if he is a legal voter, he can freely vote for whom or for what he may choose and that his vote shall be equal in effect to the vote of any other citizen. Sections 145, 147 and 6, *supra*, must be construed together and in so doing it is manifest that the legislature in enacting registration laws, under section 147, *supra*, has not the power to enact such a law as will add to the voter a qualification necessary to exercise the right of suffrage in addition to the qualifications prescribed by sections 145 and 147, *supra*, or to cut off the voter from the ballot box without fault on his part, or prevent his vote from being equal to that of any other citizen as guaranteed him by section 6, *supra*. A few courts in states where the Constitutions were silent upon the subject of registration but where they prescribed the qualifications of voters, have held that any kind of law requiring registration was invalid, because if the law prohibited any one from voting, who was otherwise qualified, that it added an additional qualification to the right of suffrage other than the Constitution required, and was therefore inconsistent with it, but the great majority of the courts, even where there was no constitutional provision permitting it, have held where the constitution did not prohibit it, that the legislature possessed the power in the exercise of its rights to regulate elections to provide for a registration of the voters, previous to an election, for the purpose of having it determined who the legal voters were, and as a preventative to fraudulent and illegal voting; holding that the prevention of illegal voting was but putting into effect the provision of almost every Constitution in relation to free and equal elections. In such cases the registration does not require any qualification of the voter other than that already held by him, but is merely a regulation of the exercise of the right of suffrage. Such power was exercised by our legislature under the Constitution of 1850, which was silent upon the subject of registration. Owensboro v. Hickman, 90 Ky. 629; Commth. v. McClelland, 83 Ky. 686. The precedents in the various juris-

dictions to which I have had access, do not shed a great deal of light upon the exact question, here, because they have been rendered in the light of various statutes containing various provisions touching the registration of voters, and under constitutional provisions which were peculiar to those jurisdictions, and in states which have constitutional provisions requiring legislatures to enact registration and in others where the Constitution made no mention of the subject, but a universal principle to which all the courts adhere, more or less definitely, is that the provisions of registration laws must be reasonable, uniform and impartial, and must not deny nor abridge the constitutional right of suffrage, nor unnecessarily impede the right, and hence, if they transgress in those respects, the transgressions are fatal to their validity.    Mr. Cooley in his work on Constitutional Limitations laid down the rule to be: "All regulations of the elective franchise must be reasonable, uniform and impartial, they must not have for their purpose, directly or indirectly, to deny or abridge the constitutional rights of citizens to vote, or unnecessarily impede its exercise. If so they must be declared void." Our Constitution requires the legislature to provide for registration in cities which have a population of five thousand or more, and permit it to provide by registration for other voters in the state.    The rule of common sense and reason applied to our constitutional requirements would seem to be that in as much as the Constitution requires in some instances and permits in others, the legislature to provide registration and to prescribe the mode of registration, it would have the power to enact such legislation upon the subject as it deems expedient and wise, but its legislation would have to stop short of denying any constitutional right of the elector to vote.    Section 143 of the Constitution prescribes the qualifications of an elector and section 147 provides that the elector must in some areas be required to register and in others may be required, but it does not authorize the legislature to deny to him the rights guaranteed to him by section 145 and section 6, and the legislation must not be such as to deprive any one of an opportunity to exercise it, who has the qualifications prescribed by section 145, unless the elector looses it by his own negligence in failing to comply with reasonable regulations as to his right of suffrage, or the loss is the result of unforeseen misfortune, against which the wisest and best law can not guard. The

elector may be required to register to entitle him to cast a vote, and at such reasonable time previous to the election as the legislature may in its discretion provide, but the terms of the law must not be such as to deprive the elector altogether of the right to vote, provided he has the necessary qualifications when the election time arrives, and has complied with reasonable regulations as to registration. There appears to be no difference in the rule touching the power of the legislature to enact registration laws, between the state whose Constitution is silent upon the subject of registration, and the one whose Constitution authorizes the legislature to provide for registration. In the state of Maryland where there is constitutional authority for registration laws, in Pope v. Williams, 9 Md. 59, it was said:

"Under pretense of regulating such procedure no person can be precluded or hindered from the complete enjoyment of his rights as guaranteed to him by the Constitution of the State or of the United States." In People, etc. Van Bokheln v. Canady, 73 J. C. 198, referring to the necessary nature of a registration law, the court said:

"It is to facilitate the exercise of the right of the ballot, and not to defeat it."

In support of the view above expressed, will be found the cases of Gillesby v. Canyon Co., 17 Idaho, 586, and People v. Hoffman, 116 Ill. 587. Sections 143, 147 and 6, *supra,* must all be obeyed, and the rights of the citizen preserved under them. They must be construed together, and a registration statute must be such in its provisions as to give the elector, who is qualified to vote at the election, whenever it may be, a reasonable opportunity to register, otherwise he is denied his rights as a citizen, and the election can not be free and equal. Hence, it becomes necessary to examine the act under consideration, and to determine whether in its provisions it measures up to the requirements of the Constitution. In so doing I am not insensible of the great responsibility which rests upon a court or judge, who dares to challenge the constitutional validity of an act of a co-ordinate and equal branch of the government like that of the General Assembly, and I have not overlooked the principle which requires me to presume that every act of the legislative department has been and is within its constitutional powers, but I have endeavored in the application of this

principle to so construe this act as to make and hold it to
be in accordance with every constitutional provision, and
have been forced to the conclusion at which I have ar-
rived.   I am furthermore not insensible that it is a su-
preme duty which I cannot avoid if I would, to refuse to
permit any infringement of the constitutional rights of
the citizens, or any evasion of the provisions of the or-
ganic law of the land, and I will not shirk that duty as I
see it.

(f)   The act in the third section, provides that:
"Said officers (registration officers) shall register every
citizen of the United States of his or her precinct, who
shall apply to be registered at the time and in the man-
ner required by law, who shall be twenty-one years of
age at the next election, who has been a resident of the
state one year, of the county six months, and of the pre-
cinct in which such person offers to register sixty days
next preceding the election."   This section prescribing,
who shall be entitled to register is somewhat ambiguous,
but by changing the words "who has been a resident,
etc." into "who will be a resident, etc." it can be fairly
construed to embrace every person who will be a legal
voter at the next election, but there is nothing in it to
indicate to what election it has reference, but by a refer-
ence to the first section of the act which prescribes the
qualifications of voters, who will be entitled to vote at
the regular November election, and section 6 of the act
which provides a day for registration in the year, 1922,
sixty days preceding the regular November election, it
is apparent that the election mentioned in this section,
*supra,* the time of holding which shall control the right
to register, is the regular November election, to be held
in each year.   This conclusion is further strengthened
by the fact that it would be impossible on the second
Monday in July, 1922, or on the same day in any year
thereafter, to know when any other election might be
held, and the section is obliged to refer to an election
whose time is fixed, as the many special elections which
may be authorized to be held may be held at various
times, which can not be known such a length of time be-
forehand. While the 7th section, among other things, pro-
vides that: "No person shall be entitled to vote in any
precinct unless he or she has been properly registered
therein, as herein provided, and the registration thereof
having taken place at least sixty days prior to such elec-
tion," the first section does not make the registration a

qualification to vote, except "for all officers elected by the people," and thus would seem to be an attempt to put into a class to themselves elections for public officers, which is a classification of doubtful validity as there could probably be no reasonable difference between the qualifications required of an elector to vote for an officer, and one to vote on a public measure. Besides, at the regular election of officers in November of each year, the same ballots used for voting for officers are used for voting for and against public measures, such as constitutional amendments, etc., and if a registered voter could vote for officers as well as measures, while the one not registered could only be entitled to vote for or against a public measure and not for officers, he would be deprived of the right of suffrage, because he could not obtain a ballot. In as much, however, as section 3 of the act makes it apply to all special elections by requiring the registration books to be used at such elections, which could be for no other reason except to determine who were entitled to vote thereat, and the quoted provision of section 7 prohibiting any one from voting in any precinct except he be registered, leads me to the conclusion that the legislative intention was that the law should apply to all elections, special and general, and that the act according to its terms bars any one from casting a ballot at any kind of an election, unless he or she is registered. To hold otherwise would be to hold the act to be unconstitutional, for if registration is not required to qualify one to vote upon a public measure, at a regular general election, but does require registration to vote for officers at such an election, the unregistered voter would be disfranchised for the reason there would be no machinery provided to enable him to vote. Construing the act to provide that any one who will be eligible to vote at the following November election may register upon the registration day in July, and is qualified thereafter to vote in any general or special election held sixty days after the registration, does the act yet deny or abridge the right of suffrage to any? According to the terms of the act, no one could vote in the regular primary election in the year, 1922 because not registered sixty days theretofore, and to entitle any one to vote in a primary, he would have had to be registered in the previous year, but as primaries are not constitutional elections, doubtless the legislature may prescribe the

qualifications of voters at such an election, although it manifestly had no intention to bar all the voters from the primary in 1922. If a citizen having all the constitutional qualifications prescribed by section 145, *supra*, to vote, is, on account of physical infirmity unable to attend in person the registration in July of the year 1922, he may yet have a chance to register at the registration provided for sixty days before the election in November for the year 1922, but after that year there is only one day provided for registration, and that is on the second Monday in July, annually. If I could hold that the provisions of the act provided a reasonable opportunity to register, to vote at the November election and for such special elections as might be held between the second Monday in July, and the November election, there are no provisions in the act which would enable any one who had not therefore registered to entitle him to vote at any special election, which might be held between the November election and sixty days after the registration on the second Monday in July, of each year. A citizen who removes from another state and becomes a citizen of this state, and by reason of one year's residence in a county, becomes entitled to vote just following the November election, could not register until July, following, and hence, would be deprived of the right to vote at any election from the time he became entitled to vote until sixty days following the registration in July, and without fault upon his part. The person becoming twenty-one years of age after the November election in any year, without fault or neglect on his part, could not vote at any election until sixty days after the second Monday in July. The registered voter who removes from the county of his registration into another county, at such a time as will not authorize him to vote at the following November election, if he should by reason of residence become entitled to vote immediately after that election or previous to it, but less than sixty days previous to it, he could not register in the county to which he removes until the registration day of July of next year, and registration upon that day would not qualify him to vote until sixty days thereafter, according to the terms of the act. These classes of citizens compose a considerable percentage of the legal voters in every precinct, and they are deprived of the exercise of the rights of suffrage at any special election as designated above, not by any fault, neglect or misfortune upon their part, but because of the terms of

the act in question, which prevent them from exercising the right of suffrage when they are qualified as by the Constitution required, except the matter of registration. I can not find any ground upon which to hold that the act does not, in relation to classes of voters mentioned, and under the circumstances, not only abridge their right of suffrage, but entirely destroys it. I have been cited to no authority which holds that the legislature has such power, nor is any argument advanced by the defendants justifying the General Assembly to exercise such a power. At the special elections municipalities and counties may encumber themselves with large debts, and they are ordinarily not held on the days of the regular election; are matters of great importance to the taxpayers, and it is a matter of common knowledge, we know they are of frequent occurrence. Furthermore, we know as a matter of history, that scarcely any of the General Assemblies which have convened in the state, but have vacancies created in them by the deaths of the members which results in special elections, and that those elections, although for officers, in the language of the act, the classes of voters above mentioned are all prevented from exercising the right of suffrage by the terms of the act, if the elections are held after the November election, which is usual. While section 1495, Ky. Stats., may provide a registration for a special election for those who did not register in July, in cities and towns of five thousand persons and more, but the act under consideration itself makes no provision for the registration of any for any special election, except at the regular registration in July, and outside of the areas where the Constitution requires registration there is no opportunity for the classes mentioned above, although constitutionally eligible to vote, to register before any special election.

(g) After the 1922 registration, only one day is provided for the registration of such persons legally qualified to vote at the following November election, as have not theretofore been registered.

The complaint of those persons who are attending to their own affairs upon registration day, and fail to register because they esteem their business affairs above the right of suffrage, may be dismissed upon the ground that the result is as they chose it, and the voter who has not theretofore been registered, and is unable from physi-

cal infirmity to attend the registration, could be said to be the unfortunate victim of providence, and his complaint dismissed, although that would be a harsh rule, that he might be sick upon another day for registration, or on the day of election, but the classes of citizens who upon the day of registration are performing public duties by compulsion of the law, as public officers, the nature of whose duties upon the particular registration day, are. such that they are unable to attend the registration because of being required to do duty for the state, militiamen on duty, jurors and such like, would be prevented from voting not because of any fault of theirs, but· because the law required them to be elsewhere, and the act in question has made no provision for their registration, and to such an extent seems to be an unreasonable regulation. In a number of cases in different jurisdictions where statutes allow a number of days for registration during the year, and make no provision for those voters, who are then ill and unable to attend the registration, have been held unnecessarily to restrict the right of suffrage and therefore unconstitutional. The law under consideration providing that a second registration is not required of any one so long as he remains a citizen of the same voting precinct, and the result being that the number prevented from registration on account of sickness on those occasions might be infinitesimal, the rule might not be applied as in the cases of Attorney General v. Detroit, 78 Mich. 545; State v. Corner, 22 Neb. 263, and Dragget v. Hudson, 43 Ohio St. 548, but manifestly a regulation which prohibits one who is required by law to be at a place where he can not register and thereby to be deprived of the right of suffrage for fourteen months thereafter, can not be said to be a reasonable regulation of the right of suffrage.

For the reasons above given, I am constrained to hold that the act is in violation of section 6 of the Constitution, and for such reason the injunction is granted.

I called into consultation with me all the judges of the Court of Appeals, and their views were invited and considered. Judges Settle, Sampson, Thomas, Clarke and Moorman concur in the conclusion reached, but probably not in all the reasons given for my opinion, but Judge Clay was of a contrary opinion, and he will submit his views in a separate opinion.

### Dissenting Opinion by Judge Clay.

We are commanded by a rule of over a hundred years' standing to resolve every doubt in favor of the constitutionality of every act of the legislature, and not to declare any act invalid unless plainly violative of the Constitution. One's right to vote is of little value if his vote may be offset by an illegal vote. Therefore, it is just as important to safeguard the purity of the ballot as it is to protect the citizen in his right to vote, and a law which will accomplish that purpose should not be lightly set aside.

It may be conceded that before our state constitutions contained any provisions respecting the registration of voters, registration acts were not looked upon with favor, and were frequently held invalid on the ground that they unduly restricted the constitutional right to vote; but as our Constitution empowers the legislature to provide for the general registration of voters, and adds, "Where registration is required, only persons registered shall have the right to vote," it is clear that when registration is required, it is as much a constitutional qualification as any other requirement of that instrument, and there is no longer any reason for applying to the act the strict rule of construction which formerly prevailed.

The act in question does not provide for a registration that will be effective only for a short time, but provides for a general registration that will be effective for all time, to be followed by annual registrations of all qualified voters not theretofore registered. For the first year the act fixes three registration days, and for subsequent years only one registration day. It is conceded that three days afford the entire electorate, consisting of about one million voters, a reasonable opportunity for registering. Because of the efforts that will be made to get the voters to the polls, it is certain that practically all the voters will be registered the first year, and that in subsequent years when only one registration day is provided, not over ten per cent, or about one hundred thousand voters, will be entitled to register. Notwithstanding the fact that many thousand voters will be absent on the day of the election because of sickness or other causes, the framers of our Constitution provided only one day for holding elections. If one day affords a reasonable opportunity for all the voters to

vote, and three days are sufficient to enable a million voters to register, upon what theory can it be said that one day is not sufficient to enable one-tenth, or even one-third, of the voters to register?

But it is said that the act does not make suitable provision for soldiers and sailors, state officers and those voters who become of age after the last registration and desire to participate in special elections occurring before the next registration. It is a matter of common knowledge that soldiers and sailors who are in active service do not vote unless permitted to vote by mail, and even if we had a hundred registration days, no more would register than would register under the act in question. Of course no anxiety need be felt about the state officers. An hour instead of a day will suffice for all who are in the flesh. Those opposed to the act insist that it does not apply to special elections, but let us assume that it does. What, then, is the result? There will be no more local option elections, and as a great majority of the counties and municipalities of the state have already reached the debt limit, it is not probable that there will be very many bond issue elections. As some of these elections will take place at the general election, it will only be at rare intervals that any bond issue election will be held on some other day, and the number of voters who will be denied the right to participate therein will be infinitesimally small. A registration act that does not afford ample time for purging the registration before the election is not worthy of the name, and it is practically impossible to frame an act that will accomplish this purpose and at the same time not work a hardship in individual cases. Therefore, it seems to me that a million voters should not be deprived of the benefits of a registration law, and the state denied the right to have pure elections, merely because an insignificant number of voters might not have the opportunity to vote at a special election, if, perchance, it should happen that such an election should be called. On the whole, I am of the opinion that the objections to the act are so lacking in substance that they afford no reasonable basis for declaring the act unconstitutional.