FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
APRIL 18, 2024

_Gonzáley, C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
APRIL 18, 2024

_E. Lennon_
ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| SPOKANE COUNTY, | ) | No. 101520-8 |
| Petitioner, | ) | |
| v. | ) | En Banc |
| JILMA MENESES, in her official capacity as Secretary of the Washington State Department of Social and Health Services, | ) | Filed: April 18, 2024 |
| Respondent. | ) | |

JOHNSON, J.—This case presents an original action filed by Spokane County Prosecuting Attorney Lawrence Haskell (Prosecutor), requesting this court exercise our original jurisdiction under article IV, section 4 of the Washington Constitution.[1] The Prosecutor seeks issuance of a writ of mandamus directing Jilma Meneses, the secretary of the Washington State Department of Social and Health Services (DSHS), to comply with statutory duties under chapter 10.77

---

[1] "The supreme court shall have original jurisdiction in habeas corpus, and quo warranto and mandamus as to all state officers . . . ." WASH. CONST. art. IV, § 4.

RCW and timely provide competency services in criminal proceedings. We conclude Secretary Meneses is not a state officer and dismiss.[2]

## BACKGROUND

DSHS, through its Behavioral Health Administration (BHA), provides behavioral health intervention, treatment, and education to Washington residents.[3] Relevant to this petition[4] are the services offered to criminal defendants by the Office of Forensic Mental Health Services (OFMHS), a division of the BHA created in 2015. The OFMHS provides competency related services to criminal defendants, including evaluations for defendants whose competency to stand trial is questioned and competency restoration treatment for persons found incompetent to proceed to trial.

DSHS has a statutory duty to provide competency services when a court so orders. Under RCW 10.77.060(1)(b)(i), whenever there is doubt as to a defendant's competency, "the court on its own motion or on the motion of any party" must

---

[2] Disability Rights Washington, American Civil Liberties Union of Washington, and Washington Defender Association jointly filed an amicus brief in support of DSHS.

[3] The parties submitted an agreed statement of facts and do not dispute the veracity of the factual assertions made therein.

[4] The BHA serves a number of different populations that are not at issue in this petition, including criminal defendants found to be not guilty by reason of insanity, felony conversions (i.e., criminal defendants whose felony charges are dismissed for reasons of incompetency and are ordered to be committed to a state hospital for evaluation and possible commitment under the involuntary treatment act (ITA), ch. 71.05 RCW, and RCW 10.77.086(5)), and civil patients (i.e., persons committed under the ITA for long-term treatment). *See* 1 Agreed Statement of Facts at 7-11.

review the allegations of incompetency and determine whether a genuine doubt exists.[5] Where there exists a genuine doubt as to a defendant's competency, "the court shall either appoint or request the secretary [of DSHS] to designate a qualified expert or professional person . . . to evaluate and report upon the mental condition of the defendant." RCW 10.77.060(1)(b)(i). Once a competency evaluation is ordered, the evaluation may occur in jail, in the community, or in a DSHS facility, depending on the circumstances. RCW 10.77.060(1)(d); 1 Agreed Statement of Facts at 7-8.

Ultimately, the court determines a defendant's competency to stand trial. If the court finds the defendant incompetent, the criminal case is stayed, and the court must—depending on the circumstances—order the defendant to undergo inpatient or outpatient competency restoration treatment or dismiss the proceedings without prejudice upon agreement of the parties if there exists "an appropriate and available diversion program willing to accept the defendant." RCW 10.77.084(1)(a), .086(1)(b).[6]

---

[5] In May 2023, the Washington Legislature enacted the Engrossed Second Substitute Senate Bill 5440, which amended chapter 10.77 RCW and title 71 RCW to address the "unprecedented wait times in jail" for admission to a psychiatric facility for services related to competency to stand trial. ENGROSSED SECOND SUBSTITUTE S.B. 5440, at 1-2, 68th Leg., Reg. Sess. (Wash. 2023) (E2SSB 5440). This petition was filed before the enactment of E2SSB 5440. The Prosecutor asserts these changes to the statute are not material to this petition. Where relevant, we note how the newly enacted statute differs from the statute in effect at the time this petition was filed.

[6] Prior to the 2023 amendments, former RCW 10.77.086(1) (2022) stated that "the court shall commit the defendant to the custody of the secretary for inpatient competency restoration"

Over the last decade, the number of court orders entered for competency services has greatly increased.[7] DSHS has been unable to meet this demand, resulting in significant delays in offering competency services to defendants. Consequently, a class action was filed in federal court, challenging as unconstitutional DSHS's delays in providing competency services to criminal defendants in pretrial custody. The United States District Court for the Western District of Washington held these delays violated the class members' due process rights and issued a permanent injunction against DSHS. The injunction set strict time limits for providing competency services to defendants in pretrial custody, appointed a special court monitor, and began oversight of DSHS's efforts to comply with the injunction. *See, e.g.*, *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015), *modified on remand*, No.

---

or, in the alternative, order outpatient restoration treatment based on a recommendation from DSHS and input from the parties. The amended statute added subsection (b), which requires that the court first consider "all available and appropriate alternatives to inpatient competency restoration" for certain eligible incompetent defendants. RCW 10.77.086(1)(b). It also requires that the court "dismiss the proceedings without prejudice upon agreement of the parties" if DSHS has found "an appropriate and available diversion program willing to accept" the eligible defendant. RCW 10.77.086(1)(b).

[7] "The number of competency evaluations requiring evaluation of a defendant held in jail have more than tripled from 2,064 in 2013 to 6,199 in 2022." 1 Agreed Statement of Facts at 22-23. "Court orders for persons who are not in jail and are evaluated in the community while on personal recognizance, have grown from 1,623 in 2019 to 2,087 in 2022, a 28.6% increase." 1 Agreed Statement of Facts at 23. The demand for competency evaluations of defendants that require admission into a DSHS facility "have remained flat at 292 per year." 1 Agreed Statement of Facts at 23. "Inpatient competency restoration orders have tripled from 694 in 2013 to 2,105 in 2022." 1 Agreed Statement of Facts at 23.

C14-1178 MJP, 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016) (court order);[8] 1

Agreed Statement of Facts at 25 n.2, 38-40.

The *Trueblood* injunction and corresponding federal court oversight of DSHS's compliance are ongoing. As part of the injunction, DSHS is required to submit monthly reports to the court monitor, detailing its compliance.[9] The court monitor regularly conducts on-site visits to DSHS treatment facilities to review implementation efforts and issues reports following these visits. The federal court holds quarterly status hearings to review DSHS's efforts to timely provide competency services to class members and imposes monthly contempt fines against DSHS for its continued failure to comply with the injunction. 1 Agreed Statement of Facts at 43-45, 40 (showing that as of January 2023, DSHS has paid over $100 million in contempt fines).

Despite these efforts, DSHS's delay in providing competency services to criminal defendants continues. And, as noted by the *Trueblood* court, the individuals awaiting these services are some of our most vulnerable. The average *Trueblood* member "is a male, person of color . . . living in desperate poverty; . . . experiencing homelessness or living without stable housing; . . . possessing little

---

[8] The United States Court of Appeals for the Ninth Circuit's vacatur and remand concerns a group of defendants not at issue in this petition.

[9] These monthly reports are published and may be found at https://www.dshs.wa.gov/bha/court-monitor-reports.

likelihood of employment; . . . suffering from a serious mental illness . . . ; [and] requiring substance use disorder treatment." *A.B. by and through Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, ___ F. Supp. 3d ___ (W.D. Wash. July 7, 2023), 2023 WL 4407539, at *5. "'These vulnerable people too often find themselves involved with the criminal justice system because of nonresponsive health and human services systems upon which they would better depend for care, treatment, rehabilitation, and recovery support services.'" *A.B.*, 2023 WL 4407539, at *4 (quoting court monitor's quarterly report at 1 (June 8, 2023)). Most of these individuals have contact with the criminal justice system for "commit[ting] crimes linked to poverty and homelessness in which they live and their underlying mental health conditions. . . . [such as] theft of food, indecent exposure for urinating or defecating in public due to the lack of an available restroom[], or trespassing on private property to sleep." *A.B.*, 2023 WL 4407539, at *5. And *Trueblood* members—who await competency services in jail—"face serious harms to their physical and mental safety and wellbeing." *A.B.*, 2023 WL 4407539, at *5.

DSHS's delay in complying with its statutory obligation to provide competency services to criminal defendants is the basis for this petition for writ of mandamus. The petition specifically concerns three categories of Spokane County defendants in felony criminal proceedings ordered to receive competency services from DSHS.

The first group is out of custody defendants ordered to undergo a competency evaluation by DSHS in the community. The legislature has established a statutory "performance target of 21 days or fewer to complete a competency evaluation in the community." RCW 10.77.068(1)(c). However, according to DSHS, "most out-of-custody defendants are evaluated within 11-13 months of a court order." 1 Agreed Statement of Facts at 18. The Prosecutor asserts, and DSHS does not dispute, that some Spokane County defendants have waited well over a year for an outpatient competency evaluation. 1 Agreed Statement of Facts at 17; 3 Agreed Statement of Facts (3 Agreed Exs.), Ex. 16, at 2150 (showing one defendant waited over two years for an evaluation; ultimately, the State moved to dismiss the case while still awaiting completion of the evaluation).

The second group is out of custody defendants who have been found incompetent to stand trial and await inpatient competency restoration services. These defendants wait in the community for admission to inpatient restoration treatment in a DSHS facility. The legislature has not established any statutory time frame related to this competency service. DSHS does not prioritize this group over defendants in pretrial custody, and this group faces unknown wait times for admission into a facility. The Prosecutor alleges that as of January 31, 2023, two Spokane County defendants had waited 13 and 18 months to be admitted to inpatient restoration treatment. 3 Agreed Exs., Ex. 15, at 2109.

The third group is defendants in pretrial custody awaiting inpatient competency restoration services. These defendants have been found incompetent and ordered to undergo inpatient competency restoration treatment provided by DSHS. DSHS is statutorily required to extend an offer of admission to these defendants within 7 days from DSHS's receipt of the court order or 14 days from signature of the court order, whichever is shorter. RCW 10.77.068(1)(a), (2)(a). This group is subject to the *Trueblood* injunction, which—based on a settlement agreement by the parties—adopted the statutory time limits. *Trueblood*, 2017 WL 1488479, at *1 (modifying the injunction to provide that "DSHS shall admit class members for either inpatient competency evaluation or restoration within the shorter of either a) 7 days from receipt of order or b) 14 days from signature of order"); 2 Agreed Statement of Facts (Agreed Exs.), Ex. 11, at 1827 (am. settlement agreement). In early 2023, DSHS estimated that these defendants wait approximately 5 to 6 months in pretrial custody before receiving inpatient restoration treatment.

In response to DSHS's continued delay in providing these competency services, the Prosecutor requests we issue a writ of mandamus compelling DSHS to perform its statutory obligations within reasonable timelines or, where applicable, within the specified time frames set out in RCW 10.77.068 and the *Trueblood* injunction. While DSHS's failure to comply with its statutory

8

obligations under chapter 10.76 RCW is of great concern, an original action in this court is not the proper avenue to obtain the relief sought by the Prosecutor.

ANALYSIS

The Washington Supreme Court has "original jurisdiction in . . . mandamus as to all state officers." WASH. CONST. art. IV, § 4. The Prosecutor requests that this court exercise its original jurisdiction to issue a writ of mandamus to the secretary of DSHS under article IV, section 4 of the Washington Constitution and chapter 7.16 RCW. DSHS argues we must dismiss the petition for lack of original jurisdiction because the secretary is not a state officer within the meaning of our state constitution. We conclude the secretary is not a state officer.

We recently analyzed the "state officer" question in *Ladenburg v. Henke*, 197 Wn.2d 645, 486 P.3d 866 (2021), where we discussed and applied the analytical framework this court has followed for over 100 years. In *Ladenburg*, we considered whether municipal court judges are state officers under article IV, section 4. We concluded they are not. In reaching this conclusion, we recognized that under our case law, "'state officers' refers to a narrow set of elected officials who exercise state-level authority and are in turn controlled by constitutional provisions directly governing their appointment, salary, and impeachment." *Ladenburg*, 197 Wn.2d at 650. We highlighted that the references to "state officers" in the state constitution as it existed in 1889 indicated "that when our

constitution was enacted, 'state officers' were, at a minimum, elected officers and subject to impeachment." *Ladenburg*, 197 Wn.2d at 651.

DSHS argues that *Ladenburg* established a bright line rule that a state officer must be elected and subject to impeachment. The Prosecutor counters that *Ladenburg* and "state officer" should not be interpreted so narrowly. Instead, he argues, we should interpret *Ladenburg* as establishing a list of factors to consider in assessing whether a public official is a state officer under article IV, section 4. Under this argument, impeachment and the manner of appointment are nondispositive factors. The Prosecutor argues this approach is consistent with the *Ladenburg* analysis and our case law.

While we expressly stated that a state officer must be elected and subject to impeachment, our analysis in *Ladenburg* treats these characteristics as factors rather than requirements. For instance, in *Ladenburg*, the municipal court judges were elected officials but were not subject to removal through impeachment. If state officers are, "at a minimum, elected officers and subject to impeachment," then we could have ended our inquiry after concluding that municipal judges were not subject to impeachment. We did not. Instead, we discussed the four characteristics that make a public official a state officer, as established by our precedent: (1) the manner in which the official was appointed to their position, (2) the source of their salary, (3) whether they are subject to impeachment, and (4) the

official's jurisdictional reach. *Ladenburg*, 197 Wn.2d at 653-59. And we called these characteristics "factors" throughout the opinion.

Additionally, *Ladenburg* suggests that the ultimate question in determining whether a public official is a state officer is whether the official is part of the "narrow group of high-ranking public officials" that is subject to state control. *Ladenburg*, 197 Wn.2d at 652. The *Ladenburg* factors help answer this question by considering whether the "state controls" the official "through appointment, salary, and impeachment" and whether the official "wield[s] some state-level authority" or "'repose[s] some part of the state's sovereign power.'" *Ladenburg*, 197 Wn.2d at 653, 652 (quoting *State ex rel. Dunbar v. State Bd. of Equalization*, 140 Wash. 433, 437, 249 P. 996 (1926)).

First, we consider the manner in which the position is appointed. *Ladenburg* summarized our case law as establishing that state officers are "limited to those *elected* officials whom the state controls." *Ladenburg*, 197 Wn.2d at 653 (emphasis added). The secretary is not an elected position.

Second, we consider whether the public official is subject to impeachment. In *Ladenburg*, we identified that impeachment has been treated as the primary factor in determining whether a public official was a state officer. We concluded the framers intended state officers to be limited to those superior officers subject to impeachment under article V, section 2 of the Washington Constitution. WASH.

CONST. art. V, § 2 ("The governor and other state and judicial officers . . . shall be liable to impeachment for high crimes or misdemeanors, or malfeasance in office."); *Ladenburg*, 197 Wn.2d at 652 (citing *State ex rel. Stearns v. Smith*, 6 Wash. 496, 497-98, 33 P. 974 (1893)). The secretary "hold[s] office at the pleasure of the governor" and is not subject to impeachment. RCW 43.17.020; RCW 43.20A.040; RCW 43.06.070 ("The governor may remove from office any state officer appointed by him or her not liable to impeachment, for incompetency, misconduct, or malfeasance in office.").

Third, we consider the source of the official's salary. A salary that is paid by the State weighs in favor of the position being a state officer. *Ladenburg*, 197 Wn.2d at 654-55. The source of the secretary's salary is the State, and the secretary's salary is fixed by the governor. RCW 43.03.028, .040; RCW 43.20A.040; 1 Agreed Statement of Facts at 3; *see also* Resp't's Br. at 35 (acknowledging the secretary's salary is paid by the State).

Fourth, an official that "wield[s] some state-level authority" weighs in favor of concluding they are a state officer. *Ladenburg*, 197 Wn.2d at 653. However, this factor is not dispositive and has previously been significant where the public official wielded part of the State's sovereign power. For instance, in *Dunbar*, we concluded that members of the State Board of Equalization—a position that was neither elected nor subject to impeachment—were state officers because the

position "reposed some part of the state's sovereign power." *Dunbar*, 140 Wash. at 437. Specifically, board members had the State's sovereign power to levy taxes. Here, the secretary's statutorily created duties, while statewide in nature, are not equivalent to a sovereign power. The legislature designed DSHS to "integrate and coordinate all those activities involving provision of care for individuals who, as a result of their economic, social or health condition, require financial assistance, institutional care, rehabilitation or other social and health services." RCW 43.20A.010. And DSHS carries out its duties and administers its programs across the state of Washington, with the secretary acting as the chief executive officer. RCW 43.17.020; RCW 43.20A.050. However, the secretary's statutory duties are not comparable to the State's sovereign powers.

Because the secretary is not elected, subject to impeachment, or granted a State sovereign power, we conclude the position is not a state officer under article IV, section 4 of the Washington Constitution. Accordingly, we dismiss the petition for writ of mandamus.

Johnson, J.

WE CONCUR:

González, C.J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Stephens, J.

Whitener, J.

Gordon McCloud, J.

Keenan, J.P.T.

No. 101520-8

MONTOYA-LEWIS, J. (concurring)—I agree with the majority but write separately to emphasize the complexity of the procedures involved that would allow this court to address the underlying issues raised by this writ of mandamus. The issue of how trial courts ensure that those who come before the courts with competency issues are treated fairly gave me grave concern during my time as a Whatcom County Superior Court judge. There, I signed hundreds of orders for both in-custody and out-of-custody competency evaluations and restoration orders, and, eventually, signed many orders holding the Washington State Department of Social and Health Services (DSHS) in contempt for failing to timely provide these services.

The federal *Trueblood*[1] litigation has provided some relief for its class members (in-custody defendants) by reducing the wait times for competency evaluations. But, as the majority notes, millions of dollars of contempt fines have been issued and are still being issued against the State for violations of federal orders under *Trueblood* and of state court orders finding repeated violations of court orders

---

[1] *Trueblood v. Wash. State Dep't of Soc. & Health Servs.*, 101 F. Supp. 3d 1010 (W.D. Wash. 2015), *modified on remand*, No. C14-1178 MJP, 2016 WL 4268933 (W.D. Wash. Aug. 15, 2016) (court order).

requiring that services be performed within a certain time frame. Majority at 4-5. During the last several years, the backlog of people needing such services has only grown. The growth in the need for such services has been the subject of much speculation, but the reason for the need matters less than the demand for the services. As the State emphasized during oral argument in this case, it has sought and received additional funding from the legislature for additional evaluation and restoration beds, more staffing, and even additional hospitals. Wash. Sup. Ct. oral arg., *Spokane County v. Jilma Meneses*, No. 101520-8, at 28 min., 9 sec. through 29 min., 1 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://tvw.org/video/washington-state-supreme-court-2024011343/. Even as these services are being added, wait times for many of these services has either stayed the same or increased. The consequences for this situation are dire and, in my view, should be viewed as tragic for the people waiting for services and risky for the public when people with outstanding criminal cases cannot get to trial because they are waiting for competency evaluations or restoration services; and it should serve to remind our judicial system that "justice too long delayed is justice denied." MARTIN LUTHER KING, JR., *Letter from Birmingham Jail, in* WHY WE CAN'T WAIT (1964).

I had hoped that a writ such as this one or some similar procedure would bring this crisis to this court in a way that would allow us to be part of the solution to this enduring problem. Though I do not believe that this court possesses a singular

solution, I do understand why the plaintiffs attempted to get the court's involvement: because the issue appears intractable. As amici suggested in their briefing, counties facing this issue could divert those with mental health issues from the criminal justice system into community based mental health services, and could choose not to file so many of these cases as criminal cases when they stem from mental health issues. Br. of Amici Curiae Disability Rts. Wash., Am. Civ. Liberties Union of Wash., and Wash. Def. Ass'n at 3, 20-24. Even where there have been attempts to address this issue within communities, a lack of funding and increasing demand for such services has proved that diversion can be only part of the solution.

The primary reason I write separately is to note that there does not appear to me to be any obvious legal procedure by which a case involving competency or restoration wait times gets to an appellate court. Allow me to explain via three hypothetical scenarios that illuminate the problem.

SCENARIO #1: A person is charged with two felonies for entering a grocery store from which they are trespassed and stealing a cart full of food, then gets arrested and comes before a judge for arraignment. Prior to the hearing, the person meets with assigned defense counsel, who finds the person to be responding to external stimuli that is not there (talking back to voices, seeing people who are not in the room). Defense counsel motions the court for a competency evaluation and the State recommends that the person be held on $50,000 bail. The judge sets that

bail and orders a competency evaluation be completed in accordance with the statute. That deadline passes, the person remains in custody without evaluation or mental health support and requires significant time from correctional officers due to the ongoing mental health crisis. The judge finds DSHS in contempt and orders a daily fine until an evaluation is performed, and eventually the person is taken to an inpatient state-run facility and evaluated.

The evaluator finds the person is suffering from a serious mental health disorder and also finds that with in-patient treatment for competency restoration, the person is reasonably expected to be rendered competent. The person returns back to the county jail to wait for an open restoration bed, while continuing to decompensate in jail. Eventually, a restoration bed opens, the person is transported there, spends 90 days receiving medications and treatment, and is restored to competency. They are transported back to the county jail to address the charges for which they were arrested. Since the date of arrest and the return after restoration services, six months has elapsed.

The defendant and defense counsel meet to decide how to proceed in the case. The prosecutor makes an offer to the defendant to plead guilty to one of the charges and receive credit for time served. The defendant accepts that offer, pleads guilty, and gets released from custody into the community (probably without any ongoing care plan in place). At this point, the case ends and no appeal occurs.

SCENARIO #2: A young person is found setting fire to a local library and is arrested at the scene and booked into custody. Upon being charged for arson, the police note that the person has five prior convictions for arson. At arraignment, the defendant pleads not guilty and bail is set at $250,000. Defense counsel meets with the defendant a few days later, in custody, and believes the defendant is suffering from a mental illness. Defense counsel asks for a hearing at which the judge orders a competency evaluation. Again, the defendant waits longer than the statutory minimum for an evaluation but ultimately receives one. The defendant is referred to restoration, but after multiple restoration periods, experts determine the defendant to be unrestorable, and the case resolves either by (1) the State dropping the charges entirely or (2) proceeding to a trial with an insanity plea. If found not guilty by reason of insanity, the defendant may be committed to a mental health facility for years. Again, I see very few ways the issue—waiting longer than the statutory minimum for an evaluation and being deemed unrestorable—may become an appealable issue.

SCENARIO #3: A defendant is charged with a low-level felony theft and is released without having to post bail. After some initial meetings with the defense counsel, counsel believes the client is unable to participate in their own defense due to a multitude of conspiracy theories they advance that led them to commit a crime. At a pretrial hearing, defense counsel seeks an out-of-custody competency

5

evaluation. The defendant is placed on a waiting list, which is several months long. When an appointment opens for their evaluation, the defendant's location has become impossible to determine because they have lost their housing. The court issues a bench warrant for failure to appear at their next hearing and they remain on bench warrant status for years. The case does not advance past this stage given the defendant's unknown whereabouts. Should the defendant be arrested while on warrant status, the defendant would likely need the same competency evaluation, which, again, may not happen for months.

I could advance multiple other scenarios demonstrating the complexity of how these cases evolve. But primarily, I am showing that there are few scenarios, if any, that lead an appellate court to be able to grapple with the problems of competency evaluations and restoration orders being provided in a timely way under the statute, or in a timely way for a case to be resolved in the instance that the statute does not set out a statutory time period for the completion of evaluations.

Thus, it remains an ongoing and daily frustration of the trial courts who have to manage huge backlogs of competency evaluations and restorations, which then results in the resolution of cases, either through trial, plea, or dismissal. Trial courts have limited enforcement authority beyond contempt findings and fines. Ultimately, the payment of contempt fines comes from public budgets that are also needed to address the underlying issue. Consequently, many judges are reluctant to assess

those fines but see little else that can move the State forward in meeting this extraordinary and growing need.

Again, I do not think the appellate courts necessarily have an answer to this problem either. I recognize that the federal court in *Trueblood* has undertaken a tremendous, yearslong effort to get the State closer to compliance for in-custody defendants, and there has been improvement. But this does not address out-of-custody matters and has not solved this issue overall. While I agree with the majority that this writ has not been the appropriate vehicle for this case to be addressed by this court, I struggle to see how this issue ever reaches this court to begin with and, therefore, worry that this problem will continue to worsen and become an intractable barrier that trial judges struggle to solve alone.

Therefore, I respectfully concur.

_____
Montoya-Lewis, J.